FILED IN CLERKS OFFICE

AUG 19 '25 PM 2:13 USDC MA

# UNTIED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHRISTOPHER KELLEHER,<br>Plaintiff,<br><br>v.<br><br>TOWN OF BROOKFIELD<br>SARAH CAMPBELL, in her individual and<br>official capacities,<br>MAUREEN LEPAK, in her individual and<br>official capacities,<br>KIMBERLY SIMONS, a/k/a KIMBERY<br>HURLEY in her individual and official ca-<br>pacities,<br>KAREN REYNOLDS  in her individual ca-<br>pacities<br>JOHN DOE (Town Official Responsible for<br>Election Notice), in both individual and of-<br>ficial capacities,<br>Defendants | CIVIL ACTION NO.<br>4:25-cv-40071-BEM<br><br><br>**AMMED COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

EXECUTIVE SUMMARY ………………………………………………………………3

I. INTRODUCTION ……………………………………………………………………5

II. PARTIES ……………………………………………………………………………7

III. JURISDICTION AND VENUE …………………………………………………… 8

IV. FACTUAL ALLEGATIONS ………………………………………………………9

 A. OFFICIAL MISREPRESENTATION OF ELECTION LAW …………………………… 9

 B. COORDINATED JUDICIAL SUPPRESSION OF PROTECTED SPEECH …………… 11

 C. POLITICAL FLYER TARGETING DEFENDANT CAMPBELL …………………………13

D. RETALIATION AND PUBLIC SHAMING OF PUBLIC RECORDS REQUESTERS ... 14

E. COORDINATED RETALIATION FOLLOWING ADA LAWSUIT NOTICE ............. 16

F. WEAPONIZATION OF ADA ACCOMMODATION REQUESTS ...........................19

V. ADDITIONAL FACTUAL ALLEGATIONS REGARDING SARAH CAMPBELL'S

PERJURY AND ABUSE OF JUDICIAL PROCESS ............................................. 20

VI. ADDITIONAL FACTUAL ALLEGATIONS REGARDING DEFENDANT SIMONS –

MISUSE OF JUDICIAL PROCESS ....................................................................23

VII. ADDITIONAL FACTUAL ALLEGATIONS REGARDING DEFENDANT MAUREEN

LEPAK – MISUSE OF JUDICIAL PROCESS AND DEFAMATORY STATEMENTS .......26

VIII. POST-ORDER RETALIATION, ADA OBSTRUCTION, AND COORDINATED

EXCLUSION BY TOWN OFFICIALS ............................................................   33

IX. FALSE ACCUSATIONS, TARGETED PROVOCATION, AND DISABILITY-BASED

DEFAMATION BY KAREN REYNOLDS .........................................................35

COUNT I – FIRST AMENDMENT RETALIATION UNDER 42 U.S.C. § 1983 ................ 39

COUNT II – VIOLATION OF THE MASSACHUSETTS CIVIL RIGHTS ACT

(M.G.L. c. 12, §§ 11H–11I) .............................................................................   41

COUNT III – ABUSE OF PROCESS .................................................................... 44

COUNT IV – LIBEL AND SLANDER (DEFAMATION) – DEFENDANT LEPAK

AND TOWN OF BROOKFIELD ........................................................................47

COUNT V – LIBEL AND SLANDER (DEFAMATION) – DEFENDANT REYNOLDS....... 51

COUNT VI – CIVIL CONSPIRACY (COMMON LAW) .......................................... 56

2

COUNT VII – VIOLATION OF SECTION 504 OF THE REHABILITATION ACT AND

    TITLE II OF THE ADA ................................................................................60

COUNT VIII – VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT

    (42 U.S.C. § 12131 ET SEQ.) .................................................................64

COUNT IX – VIOLATION OF SECTION 504 OF THE REHABILITATION ACT

    (29 U.S.C. § 794) ....................................................................................68

COUNT X – VIOLATION OF COURT-ORDERED ACCOMMODATIONS UNDER

    G.L. c. 258E; INTERFERENCE WITH CONSTITUTIONAL RIGHTS

    (MASSACHUSETTS CIVIL RIGHTS ACT; 42 U.S.C. § 1983) ...............................72

COUNT XI – MONELL LIABILITY UNDER 42 U.S.C. § 1983 ...................................76

COUNT XII – ELECTION INTERFERENCE .........................................................97

PRAYER FOR RELIEF ..................................................................................103

**EXECUTIVE SUMMARY**

This action arises from a coordinated campaign of retaliation, defamation, and statutory violations carried out by multiple Brookfield officials and their allies to silence Plaintiff's protected speech, obstruct his civic participation, and suppress political opposition.

Over a compressed period in April–May 2025 — coinciding with ongoing civil rights litigation and the lead-up to the May 6 municipal election — Defendants misused harassment prevention orders under G.L. c. 258E, published false and stigmatizing statements, disclosed confidential disability-related communications, and denied court-ordered accommodations for public meeting access.

These acts were not isolated. They reflect a well-established pattern of conduct by the Town of Brookfield and its officials:

    A. Using judicial process for purposes unrelated to its lawful function;

    B. Disparaging residents and employees who file complaints, file Freedom of Information Act requests, seek ADA accommodations, or engage in political speech;

    C. Ratifying misconduct through deliberate inaction, public validation, and discriminatory policies; and

    D. Interfering with election processes by disseminating false information and suppressing opposing campaigns.

The Complaint sets forth twelve counts under federal and Massachusetts law — including claims for First Amendment retaliation, Massachusetts Civil Rights Act violations, abuse of process, defamation, civil conspiracy, election interference, and multiple violations of the ADA and Section 504. Each count is supported by detailed factual allegations showing how Defendants' coordinated actions targeted the same protected activities and rights through overlapping tactics and actors.

## I. INTRODUCTION

1. This is a civil rights action under 42 U.S.C. § 1983, the Massachusetts Civil Rights Act, and related statutes, arising from a coordinated campaign by Town of Brookfield officials to retaliate against Plaintiff Christopher Kelleher for engaging in protected political speech, petitioning activity, and disability-based accommodation requests in the weeks preceding the May 6, 2025 municipal election.

2. Acting in both official and personal capacities, Defendants:

>    A. Published false and misleading election information on the Town's official website, timed to suppress a lawful write-in campaign and chill protected voter expression;

>    B. Orchestrated the simultaneous filing of three G.L. c. 258E harassment prevention petitions—based on knowingly false or grossly distorted statements—to silence Plaintiff's political advocacy, exclude him from Town property, and damage his reputation; and

>    C. Disseminated defamatory statements to law enforcement, courts, state agencies, and the public to discredit Plaintiff as a journalist and civic watchdog.

3. These acts were not isolated disputes. They were part of a broader, longstanding municipal custom of retaliation against residents and employees who file complaints, request records, speak critically at meetings, or otherwise challenge Town leadership. This custom is maintained and ratified by final policymakers, despite repeated notice through prior lawsuits, MCAD complaints, and documented resignations of Town personnel.

4. Plaintiff was not a candidate in the May 2025 election. His activities—organizing a sticker campaign for a respected community member, publishing investigative flyers, and posting documented video evidence of official misconduct—were lawful political speech protected under the First Amendment and Articles 9 and 16 of the Massachusetts Declaration of Rights.

5. The election was decided by a margin of **40 votes**. The unconstitutional gag order obtained through one of the ex parte harassment petitions directly suppressed Plaintiff's ability to publish and distribute final campaign materials during the critical days before the vote, likely affecting the outcome.

6. Plaintiff seeks:

      A. Declaratory judgment that the May 6, 2025 election was tainted by constitutional violations and that Defendants' misuse of judicial process, false public statements, and denial of court-ordered accommodations violated his rights under federal and state law;

      B. A court-ordered special election under judicial supervision;

      C. Compensatory and punitive damages for retaliation, abuse of process, defamation, ADA and Rehabilitation Act violations, and related claims;

      D. Injunctive relief preventing further misuse of G.L. c. 258E or other governmental powers to suppress protected civic speech.

## II. PARTIES

1. Christopher Kelleher resides in Brookfield, Massachusetts. He is a civic journalist, community advocate, and founder of The Brookfield Examiner, a Massachusetts-registered publication focused on local government transparency and public accountability. Plaintiff is also an active participant in Brookfield's civic affairs and has engaged in public comment, petitioning, and oversight of local boards and officials.

2. Defendant Town of Brookfield is a municipal corporation located in Worcester County, Massachusetts.

3. Sarah Campbell resides in Brookfield and, at all relevant times, was a candidate for the Select Board. She is sued in her individual capacity and her official capacities as Vice Chair of the Conservation Commission and as a Member of the Select Board.

4. Defendant Maureen Lepak resides in Brookfield and, at all relevant times, was a candidate for the Board of Health or the Chair of the Board of Health. She is sued in her individual capacity and her official capacity as Chair of the Board of Health.

5. Defendant Kimberly Simons, a/k/a Kimberly Hurley, is a resident of Brookfield and a member of the Board of Health. She is sued in her individual capacity and in her official capacity as a member of the Board of Health.

6. Defendant Karen Reynolds resides in Brookfield, Massachusetts. She is a private citizen and member of the Molasses Hill group. She is sued in her individual capacity for her

involvement in a coordinated effort to retaliate against Plaintiff for his protected civic speech.

7. Defendant John or Jane Doe is an as-yet unidentified Town of Brookfield employee or official responsible for the April 29, 2025 publication of false information on the Town's official website concerning the May 2025 election. Defendant Doe is sued in both their individual and official capacities for their role in the unlawful publication and the ongoing failure to correct the misleading notice.

## III. JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983, Title II of the Americans with Disabilities Act (42 U.S.C. § 12131 et seq.), and Section 504 of the Rehabilitation Act (29 U.S.C. § 794).

9. This Court has supplemental jurisdiction over Plaintiff's related state-law claims under 28 U.S.C. § 1367 because they arise from the same case or controversy as the federal claims, including claims under the Massachusetts Civil Rights Act, common law defamation, abuse of process, and civil conspiracy.

10. Venue is proper in the United States District Court for the District of Massachusetts under 28 U.S.C. § 1391(b)(1)–(2) because all Defendants reside in Massachusetts and a substantial part of the events or omissions giving rise to the claims occurred in Worcester County, Massachusetts.

11. This action is not moot. Plaintiff challenges both past violations of constitutional and statutory rights and the ongoing consequences of those violations, including the seating of an elected official whose victory was tainted by unlawful suppression of protected speech and denial of court-ordered accommodations. Plaintiff seeks declaratory, injunctive, and monetary relief to redress ongoing harm and to prevent recurrence.

## IV. FACTUAL ALLEGATIONS

The following factual allegations describe a continuous and coordinated pattern of retaliation, defamation, statutory violations, and election interference by the same core group of Brookfield officials and their associates, whose overlapping actions targeted Plaintiff's protected speech, disability rights, and civic participation through multiple, mutually reinforcing tactics.

### A. Official Misrepresentation of Election Law

12. In April 2025, Plaintiff and other Brookfield residents promoted a lawful write-in campaign for Michael Seery for the Brookfield Board of Health. This effort was independent of any candidate and was paid for by the "Restore Our Health Board" political mailing committee.

13. The committee's flyer, clearly marked "Paid for by the Restore Our Health Board, independent of any candidate or campaign, Brookfield, MA," encouraged voters to write in Michael Seery as an alternative to the sole ballot candidate, Defendant Maureen Lepak.

14. The write-in campaign's purpose was to demonstrate public dissatisfaction with the sole candidate and to encourage Mr. Seery to consider serving if elected.

15. On April 29, 2025, less than one week before the election, the Town of Brookfield published the following statement on its official taxpayer-funded website:

16. "Michael Seery is not a write-in candidate for the Board of Health. See list of official candidates below. Please be advised that contrary to the recently mailed campaign flyer, Mike Seery is NOT a write-in candidate for the Board of Health and will NOT SERVE if elected."

17. This statement was false and misleading. Under Massachusetts election law, any eligible voter may be elected via write-in vote regardless of whether they have "declared" candidacy or agreed to serve.

18. The statement was timed to coincide with the final days of voting, creating a chilling effect on voter participation and discouraging residents from casting write-in votes.

19. By disseminating this false legal guidance through official channels, the Town engaged in viewpoint-based electoral interference and prior restraint on protected political speech in violation of the First Amendment and Article 9 of the Massachusetts Declaration of Rights.

20. Shortly after Plaintiff initiated this lawsuit, the Town removed the above-referenced statement from its official website without issuing a correction, clarification, or apology. The removal of the statement, without public acknowledgment, supports an inference that

the Town acted with knowledge of its unlawfulness and sought to conceal or destroy evidence of the misconduct.

21. Plaintiff does not yet know which municipal official or employee authored or authorized this message. Defendant John/Jane Doe is named as a placeholder for the responsible party pending identification through discovery.

22. The false statement, made under color of law and using official Town resources, was consistent with a broader municipal custom of suppressing political opponents and retaliating against those engaged in protected civic activity.

## B. Coordinated Judicial Suppression of Protected Speech

23. In April 2025, three Brookfield officials — Defendants Sarah Campbell, Maureen Lepak, and Kimberly Simons — each filed separate petitions for harassment prevention orders against Plaintiff under G.L. c. 258E.

24. Each petition was based on Plaintiff's lawful civic and political activities, including ADA accommodation requests, public criticism of Town officials, filing of open meeting law complaints, distribution of political flyers, and communications with the press.

25. The petitions advanced overlapping and coordinated allegations, many of which were factually false, misleading, or unsupported by evidence.

26. Several allegations in the petitions concerned matters of pure political speech — such as Plaintiff's statements during public meetings, YouTube videos criticizing official conduct, and emails sent to officials' government addresses on matters of public concern.

27. On information and belief, Defendants Sarah Campbell, Maureen Lepak, and Kimberly
Simons communicated and coordinated with each other prior to filing, and at least one
petition was supported by letters from additional Town-affiliated individuals, including
Defendant Karen Reynolds, who acknowledged in her letter that she submitted it "at the
request" of Town board officials.

28. The petitions were filed in rapid succession in East Brookfield District Court and were all
scheduled for hearing on the same date, creating an intensely burdensome and prejudicial
litigation environment for Plaintiff.

29. On May 9, 2025, Defendants subjected Plaintiff to three consecutive G.L. c. 258E
hearings in rapid succession — an orchestrated sequence that caused significant hardship
— after which the court nevertheless ordered accommodations to preserve Plaintiff's
access to public meetings notwithstanding any protective orders..

30. Despite this court order, Town officials later acted to block or restrict Plaintiff's access to
public meetings, including by refusing to provide remote participation links and asserting
that his accommodation request "was above and beyond what another citizen would
receive," in direct violation of the court's directive.

31. The misuse of the 258E process by municipal officials, in coordination with allied private
actors, was calculated to:

    A. Silence Plaintiff's criticism of Town governance;

    B. Damage his credibility and reputation during an active municipal election; and

    C.  Create a legal pretext for excluding him from public forums.

32. These actions constitute retaliation against protected speech, abuse of process, and prior restraint in violation of the First Amendment, Article 16 of the Massachusetts Declaration of Rights, and 42 U.S.C. § 1983.

## C. Political Flyer Targeting Defendant Campbell and Resulting Prior Restraint

33. On or about April 29, 2025, Plaintiff, through his civic journalism initiative "Truth Receipts," distributed a political flyer titled "IS SARAH CAMPBELL READY TO LEAD BROOKFIELD?".

34. The flyer cited publicly available records and documented findings regarding Campbell's performance as a public official, including:

    A.  Misuse of authority;

    B.  False statements to state regulators;

    C.  Retaliation against a municipal employee; and

    D.  Failure to comply with directives from the Massachusetts Attorney General.

35. The flyer included a QR code linking to a YouTube channel hosting video evidence and public documents supporting the stated claims.

36. Plaintiff's flyer was lawful political speech protected under Article XVI of the Massachusetts Declaration of Rights and the First Amendment to the U.S. Constitution.

37. On April 30, 2025, Campbell filed an emergency ex parte petition under G.L. c. 258E, seeking a harassment prevention order against Plaintiff based expressly on the flyer's contents and related public video material.

38. The District Court granted a temporary order, suppressing Plaintiff's campaign speech during the final days before the Brookfield municipal election.

39. On information and belief, Campbell's filing was undertaken in retaliation for Plaintiff's political criticism and was coordinated with municipal officials, including the Town Administrator.

40. Brookfield Police Chief Michael Blanchard later confirmed there were no recent complaints or calls for service that would support Campbell's emergency filing, confirming the absence of legitimate cause.

41. The misuse of the judicial process to silence a reporter and political campaign constitutes prior restraint, retaliation, and abuse of process in violation of state and federal constitutional protections.

**D. Retaliation and Public Shaming of Citizens Who File Public Records Requests**

42. The Town of Brookfield, through its high ranking elected officials, has engaged in a longstanding pattern of punishing and publicly shaming residents who exercise their rights under the Massachusetts Public Records Law, G.L. c. 66, § 10. Rather than treating public records requests as a lawful tool for government transparency, Town officials have

repeatedly used their positions to retaliate against requesters, discourage future requests, and create a climate of fear around civic participation.

43. **1. Retaliation by Defendant Maureen Lepak** – As Chair of the Brookfield Board of Health, Defendant Lepak blocked an individual using the Facebook account name "Karen Bennett" from viewing her personal Facebook page shortly after that individual submitted a public records request for Board of Health emails. Chair Lepak's personal account is regularly used to disseminate public health warnings and updates to the community, making it a de facto official channel. Blocking "Karen Bennett" deprived the requester of timely access to important public health information and served no legitimate governmental purpose. This act was taken in direct retaliation for a lawful records request and reflects viewpoint-based exclusion.

44. **2. Retaliation by Defendant Sarah Campbell** – Defendant Campbell has also engaged in retaliatory conduct toward those associated with public records compliance. In one documented incident, Campbell verbally berated Town employee Lindsay Rockwood for fulfilling an open records request, raising her voice and creating a hostile and intimidating atmosphere in the workplace. This behavior conveyed to Town employees that fulfilling public records requests could result in personal or professional hostility from senior officials, undermining lawful compliance with G.L. c. 66.

45. **3. Public Shaming by Defendant Richard Chaffee** – Chair of the Select Board, Defendant Chaffee, has repeatedly shame and criticize citizens who have filed public records requests. On multiple occasions, Chaffee has named individual requesters during

15

televised meetings, questioned their motives, and implied wrongdoing simply for invoking their statutory rights. Such public shaming serves no legitimate governmental function and is intended to chill lawful petitioning activity.

46. **4. Historical Pattern of Noncompliance** – These incidents are consistent with the Town's broader history of delaying, obstructing, or outright ignoring public records requests. Residents and media representatives have repeatedly reported difficulty obtaining timely and complete records from the Town. When records are produced, they are sometimes accompanied by disparaging commentary from Town officials directed at the requester. The repeated use of retaliation, workplace hostility, and public shaming in response to records requests evidences an entrenched municipal practice of discouraging transparency and undermining accountability.

47. This pattern of retaliatory conduct against public records requesters—by blocking public health communications, intimidating Town employees, and publicly stigmatizing residents—demonstrates the Town's deliberate indifference to transparency obligations and reinforces Plaintiff's claim of an official custom or policy of retaliation in violation of constitutional and statutory rights.

**E. Coordinated Retaliation Following ADA Lawsuit Notice**

48. On or about April 23, 2025, Plaintiff served the Town of Brookfield, Defendant Maureen Lepak, and Defendant Kimberly Simons with a final ADA notice of lawsuit. This notice explicitly warned that, due to their ongoing violations of the Americans with Disabilities Act, they faced personal liability and the potential loss of qualified immunity.

16

49. The following day, Plaintiff emailed Town officials to withdraw from all public meetings, citing safety concerns after a reported threat involving a FedEx driver and two high ranking Town officials

50. Within twenty-four hours, Defendants Lepak, Simons, and Campbell each filed petitions under G.L. c. 258E seeking harassment prevention orders against Plaintiff. The close temporal proximity between Plaintiff's ADA litigation notice and these filings supports a strong inference of coordinated retaliation. Within days, Plaintiff created and distributed two separate political flyers:

   A.  Board of Health Flyer – opposing Lepak's re-election and endorsing challenger Mike Seery, while criticizing Lepak's official actions, including her failures and retaliatory conduct.

   B.  Select Board Flyer – criticizing Campbell's conduct and containing a QR code linking to public records and videos of alleged misconduct, alongside a reference to Campbell's own public misleading comments.

44. Shortly after the flyers' distribution, Campbell contacted the Town Administrator, who in turn contacted the Chief of Police to determine whether Plaintiff's upcoming two-party hearing could be moved up. Campbell then appeared at an ex parte hearing and obtained a 258E order against Plaintiff, citing the flyer as evidence.

45. At every subsequent 258E hearing in August 2025 involving Plaintiff — whether Plaintiff was the defendant (in cases brought by Campbell, Lepak or Simons) or the

plaintiff. (in Plaintiff's own petition against Lepak) — the Town Administrator physically stood at counsel table beside the opposing party, presented "evidence" to the court, and actively participated in prosecuting the case against Plaintiff.

46. This included Plaintiff's own petition against Lepak, in which the proceeding was effectively Plaintiff versus the Town Administrator, with Lepak herself taking a secondary role. At the conclusion of that hearing, Lepak was visibly frustrated and insisted on making a statement "for the record," underscoring that the Town Administrator — not Lepak — had driven the defense effort.

47. These actions demonstrate that Plaintiff was not merely opposing private citizens in these proceedings, but was confronting the full resources and authority of the Town of Brookfield. The Town Administrator's repeated, direct participation in court—both prosecuting and defending—constitutes official action under color of law.

48. The sequencing of events—Plaintiff's ADA lawsuit notice, the coordinated 258E filings, the political flyer distribution, and the Town Administrator's courtroom participation— establishes a unified pattern of official-capacity retaliation. This pattern combines disability-based retaliation with suppression of political speech, in violation of federal and state law, and reflects a de facto municipal policy of using the judicial process to silence critics and deter ADA enforcement.

**F. Weaponization of ADA Accommodation Requests as Retaliation**

49. Beginning in August 2024 and continuing into 2025, Plaintiff made repeated requests for disability-related accommodations to participate fully in public meetings. These requests sought reasonable measures such as timely access to remote meeting links, the ability to hear all discussion, and assurance that Plaintiff would not be muted or excluded during public comment.

50. Rather than respond in good faith, Town officials routinely ignored Plaintiff's accommodation requests, failed to provide timely links, muted Plaintiff during meetings, or connected him mere seconds before proceedings began. Multiple follow-up emails from Plaintiff — escalating in urgency as the Town remained unresponsive — went unanswered.

51. Plaintiff's tone in these messages varied from formal legal notice to candid and personal appeals describing the mental health toll of the Town's conduct. These were not threats; they were direct attempts to humanize the impact of the Town's repeated exclusion.

52. Instead of engaging or remedying the access issues, Town officials cherry-picked words and phrases from these communications — stripping them of context — and used them as purported "evidence" to seek harassment prevention orders against Plaintiff. On information and belief, the Defendants; Campbell , Lepak Simons,  or other municipal officials also shared or facilitated the sharing of Plaintiff's accommodation-related emails with non-party allies, including Defendant Karen Reynolds, who later cited them in public statements attacking Plaintiff's character.

53. This weaponization of ADA requests converted protected disability advocacy into a pretext for legal action, stigmatization, and political harm. The deliberate misuse of these communications — especially by municipal leadership — sends a clear message to the broader disability community: requesting access to Brookfield public meetings carries the risk of public shaming, legal action, and character assassination. Such conduct would chill a reasonable person with a disability from requesting accommodations in the future, thereby undermining both the letter and spirit of the Americans with Disabilities Act.

## V. ADDITIONAL FACTUAL ALLEGATIONS REGARDING SARAH CAMPBELL'S PERJURY AND ABUSE OF JUDICIAL PROCESS

54. Defendant Sarah Campbell engaged in a sustained course of conduct—both before and after her election to the Brookfield Select Board—designed to silence Plaintiff's constitutionally protected speech through the knowing use of false statements, perjury, and the misuse of the judicial process under G.L. c. 258E.

### A. Pre-Election Retaliatory Animus

55. While serving on the Brookfield Conservation Commission, Campbell made repeated public statements during open meetings disparaging Plaintiff's filing of Open Meeting Law complaints, describing them as a "waste of her time," and openly seeking methods to deter further filings. "find a way to prevent Kelleher from filing" These statements, made in her official capacity, demonstrate a pre-election pattern of hostility toward civic oversight and First Amendment activity.

**B. Misuse of Judicial Process to Suppress Election Speech**

56. On the eve of the May 2025 municipal election—an election she ultimately won by only 40 votes—Campbell filed an ex parte harassment prevention petition against Plaintiff. The resulting emergency order prohibited Plaintiff him from distributing campaign materials, publishing investigative video content, and engaging in core political speech during the final days before voting.

57. Given the narrow 40-vote margin, this judicial gag order likely altered the outcome of the election by depriving voters of critical information that Plaintiff intended to release.

**C. Knowingly False Statements Under Oath**

58. Campbell's affidavits and testimony in support of her petition contained multiple materially false statements, including:

59. Alleged vehicular following (April 15 or 16, 2025)– Campbell claimed Plaintiff followed her in his vehicle at approximately 1:00 p.m. Documentary evidence—including business surveillance footage and time-stamped transaction records—conclusively proves Plaintiff was at his workplace, miles away, at the alleged time.

60. "Advisory committee" meeting surveillance – Campbell alleged Plaintiff hired an individual to follow her to a Brookfield Police Department "advisory committee" meeting. Public meeting notices confirm no such meeting occurred on the date alleged.

61. Routine drive-bys and Ring camera evidence – Campbell asserted Plaintiff drove past her residence "all day long" and claimed to possess Ring camera footage. No such footage was ever produced at any stage of the proceedings.

62. Late-emerging telephone allegation – For the first time at the two-party hearing, Campbell alleged Plaintiff called her to comment on her texting while driving. This allegation appeared nowhere in her original affidavit, was not raised at the ex parte hearing, and constitutes improper ambush testimony.

**D. Affidavit Irregularities**

63. Campbell refused to print or sign her full name under the penalties of perjury on her affidavit, raising serious questions about authorship, authenticity, and compliance with statutory requirements for sworn statements.

**E. Constitutional and Statutory Violations**

64. Campbell's conduct—knowingly submitting false sworn statements, fabricating incidents, and weaponizing G.L. c. 258E to silence a political opponent—constitutes:

65. Retaliation for protected First Amendment activity;

    A. Abuse of process under Massachusetts common law; and

    B. Violations of Plaintiff's rights under the Massachusetts Civil Rights Act and 42 U.S.C. § 1983.

### F. Incorporation of Rebuttal Evidence

66. Plaintiff has filed a comprehensive Motion for Reconsideration in East Brookfield District Court, with over 400 pages of transcripts, exhibits, and documentary evidence refuting each of Campbell's substantive allegations. That motion—incorporated herein by reference—further establishes Campbell's knowing misrepresentations, retaliatory intent, and the material impact of her conduct on Plaintiff's civic participation and electoral prospects.

## VI. ADDITIONAL FACTUAL ALLEGATIONS REGARDING DEFENDANT SIMONS MISUSE OF JUDICIAL PROCESS

67. Defendant Kimberly Simons, an elected and compensated member of the Brookfield Board of Health, filed an affidavit and petition under G.L. c. 258E seeking a harassment prevention order against Plaintiff Christopher Kelleher.

68. Her sworn statement relied entirely on seven emails sent to her official government email address in her capacity as a public official. In each instance, Simons was merely copied (CC'd); none were directed to her personally.

69. All cited emails concerned Plaintiff's ADA accommodation requests, Open Meeting Law complaints, and related civic matters within the Board's jurisdiction. None contained profanity, threats, or personal contact outside of her official role. Each was constitutionally protected speech and advocacy under Title II of the Americans with

Disabilities Act, 42 U.S.C. §§ 12131–12134, the Massachusetts Civil Rights Act, G.L. c. 12, §§ 11H–11I, and the First Amendment.

70. Simons selectively quoted rhetorical phrases and legal idioms from these communications—such as the phrase, "If you underestimate my resolve, you do so at your own personal peril"—omitting their context as part of a formal ADA demand letter entitled FINAL ADA ACCOMMODATION DEMAND – NOTICE OF IMMINENT LEGAL ACTION.

71. This language, long recognized in civil rights demand correspondence, is not a threat of violence, but a notice of impending litigation.

72. Plaintiff's April 23, 2025 email—asking whether the Town would again mute him during a public meeting—cited 28 C.F.R. § 35.160, described prior ADA violations, and requested confirmation of his right to speak. Simons portrayed these lawful requests as harassment without addressing the substance of the accommodation request or engaging in the interactive process mandated by law.

73. Simons also cited, as purported evidence of disturbing conduct, a satirical remark Plaintiff made to the Town Administrator suggesting that *he* should be "publicly shamed on the Brookfield Common like it's the year 1742 " for filing an Open Meeting Law Complaint— a plainly rhetorical and political statement. In context, the remark was directed at Plaintiff himself, underscoring its self-deprecating and non-threatening nature.

74. Simons' affidavit omitted that she is a paid policymaker bound by law to consider and respond to ADA accommodation requests. She neither acknowledged this duty nor disclosed that her refusal to respond to Plaintiff's emails contributed directly to the need for follow-up communications.

75. By seeking judicial protection from the very ADA-related communications she was legally obligated to address, Simons engaged in a retaliatory abuse of judicial process, in violation of the ADA, the Massachusetts Civil Rights Act, and the First Amendment.

76. Notably, Vice Chair Christina Predella, who received the same emails in the same capacity, did not seek a harassment prevention order. This comparator evidence demonstrates that Simons' petition was motivated by personal animus and retaliation rather than any objective threat.

77. Plaintiff alleges that Simons' conduct was part of a broader pattern of coordinated retaliation by Town officials to silence civic critics through misuse of G.L. c. 258E. This coordinated effort included:

   A.   Refusal to respond to ADA accommodation requests;

   B.   Public shaming during official meetings; and

   C.   Leveraging judicial orders to exclude Plaintiff from public forums.

78. The foreseeable and intended effect of Simons' conduct was to chill Plaintiff's exercise of his rights and deter other disabled residents from requesting access to public meetings, in direct violation of Title II of the ADA and the First and Fourteenth Amendments.

# VII. ADDITIONAL FACTUAL ALLEGATIONS REGARDING DEFENDANT MAUREEN LEPAK MISUSE OF JUDICIAL PROCESS AND DEFAMATORY STATEMENTS

## 1. Background of Retaliatory Animus

79. Defendant Maureen Lepak has engaged in sustained retaliatory conduct toward Plaintiff since at least 2023, when both served on the Brookfield Board of Health.

80. Disputes arose over public policy issues including ADA compliance, public transparency, and proposed Board regulations. In 2023, Plaintiff filed an Open Meeting Law complaint alleging false Board minutes. The Massachusetts Attorney General's Division of Open Government found in Plaintiff's favor and ordered the Board to revise the minutes. Lepak, visibly upset by the ruling, began a course of conduct evidencing personal animus toward Plaintiff.

## 2. Misuse of G.L. c. 258E to Suppress Protected Speech

81. In 2025, Lepak filed an affidavit and petition under G.L. c. 258E seeking a harassment prevention order against Plaintiff.

  A.  In her sworn statements and testimony, Lepak repeatedly characterized constitutionally protected activity—such as distribution of policy flyers, creation of a local newspaper, and public criticism of Board policy—as "harassment."

  B.  Lepak falsely claimed she was a "volunteer" entitled to special protection, when in fact she was a paid, elected public official subject to public scrutiny.

C.  She alleged Plaintiff "followed her to her car" after two Board meetings. Official records, including her own meeting minutes, prove Plaintiff was not present at one of the meetings, directly refuting the claim.

D.  At hearing, Lepak's final statement: **"someone is trying to find a way to hurt you with a lawsuit or complaints."** This admission confirms her true objective was to prevent Plaintiff from filing lawful complaints, demonstrating an improper purpose under the 258E statute.

E.  Lepak testified that Plaintiff files Open Meeting Law complaints "to seek her out" and "writes his emails carefully under the *guise* of the First Amendment." These admissions establish that Lepak viewed protected speech and oversight activity as illegitimate, and that she used 258E proceedings to suppress them.

**3. Failure to Comply with Court-Ordered Public Meeting Access**

82.  After the issuance of the 258E order, the District Court ordered the Town of Brookfield to provide accommodations allowing Plaintiff to attend public meetings. As Chair of the Board of Health, Lepak—together with Defendant Simons—refused to comply.

A.  Plaintiff filed a new Open Meeting Law complaint. In the Town's official written response, ghostwritten by the Board of Health but signed under the Town Administrator's name, the Board admitted rejecting Plaintiff's request and accused him of "demanding special treatment."

B.  The Board argued it could not be at fault because Plaintiff had directed his request to the Town Administrator, despite the fact that Lepak and Simons both knew of the court order.

C.  The Board's deliberate noncompliance constituted retaliation under the ADA and willful violation of a court directive.

**4. Use of False Third-Party Letter as Evidence**

83. In support of her 258E petition, Lepak submitted a letter from Karen Reynolds. Lepak knew or should have known the letter contained materially false claims:

A.  Reynolds alleged Plaintiff yelled at her during a public meeting for "asking a question." Publicly available video disproves this; no such incident occurred.

B.  Reynolds alleged Plaintiff removed Select Board member Richard Chaffee from a meeting while he was "sitting quietly." Video—recorded by Lepak's own husband —shows Chaffee being disruptive, ignoring warnings, and approaching the Commission table before removal.

C.  By presenting this letter, Lepak misled the court into believing independent corroboration existed for her harassment allegations, when in fact the letter was part of a coordinated effort by political allies.

**5. Defamatory Statements to Outside Agencies**

84. While serving as Chair of the Brookfield Board of Health, Defendant Maureen Lepak used her official Town of Brookfield email account, bearing the Town seal and her official title, to transmit false and damaging statements about Plaintiff on Facebook and to multiple Massachusetts regulatory agencies, including but not limited to: the Department of Environmental Protection (MassDEP), the Division of Fisheries and Wildlife, and the Cannabis Control Commission (CCC).

   A.  She falsely claimed Plaintiff's business was not located at a legitimate address, that his nonprofit provided no services, and that his prior businesses had been "dissolved by court order."

   B.  These falsehoods, communicated to agencies with licensing or enforcement authority, constitute defamation per se and intentional interference with advantageous relations.

85. Plaintiff's business address was legitimate, registered, and actively in use;

86. The nonprofit had directly assisted multiple individuals, including securing permanent housing for two homeless residents, one during a historic cold snap, for which the Spencer Police Department later thanked Plaintiff; and

87. No prior business of Plaintiff's had been dissolved by court order.

88. These falsehoods were communicated to residents and government agencies.  By transmitting them in her official capacity, Lepak gave them the appearance of verified government information. Her actions constitute defamation per se because they falsely

imputed professional misconduct and dishonesty to Plaintiff in his trade and profession. The statements also directly interfered with Plaintiff's advantageous business and professional relationships.

### 6. Republication of Adjudicated False Minutes

89. Lepak also deliberately republished meeting minutes containing statements that had already been adjudicated false by the Massachusetts Attorney General's Division of Open Government.

90. In the original minutes, Lepak falsely recorded that Plaintiff was "upset" at not being given a title and would not "accept" the boards reason.   Following a formal complaint and review of the meeting audio, the Attorney General's office determined that the statement was factually inaccurate and ordered the Town to correct the minutes.

91. Rather than comply in good faith, Lepak devised a means to reintroduce the false narrative. She read the discredited statement aloud during a later public meeting, ensuring it would be incorporated into a new set of minutes. She then caused both sets of the false minutes to be posted on a third-party website accessible to the public.

92. This republication occurred despite Plaintiff's issuance of a formal cease-and-desist letter warning the Town and Lepak that the statements were defamatory and should not be repeated. The Town took no action to remove or correct the false posting. Lepak's republication was done with actual malice, as she knew the statement had been found false by a competent government authority and targeted Plaintiff personally.

93. By using an official meeting to re-read and thereby re-publish known falsehoods, Lepak weaponized the Town's public record process to launder defamation through "official" channels, ensuring continued public availability of a statement she knew to be untrue.

94. Despite the Commonwealth's ruling and a cease-and-desist letter from Plaintiff, Lepak republished the false minutes on a third-party website, knowingly reinstating a defamatory statement with actual malice.

**7. Defamatory Statements Regarding Mental Health Disabilities**

95. In addition to her written falsehoods, Lepak has made stigmatizing and defamatory statements about Plaintiff's mental health status. On Facebook, Lepak publicly asserted that Plaintiff has "severe mental health issues." This statement was presented as fact, not opinion, and was made without any medical basis, diagnosis, or legitimate public purpose. It was calculated to portray Plaintiff as unstable and dangerous, thereby undermining his credibility, public standing, and ability to participate in civic life.

96. Lepak's hostility toward individuals with mental health disabilities is further evidenced by her public comments about another Brookfield resident who was in the midst of a mental health crisis. Referring to that incident on Facebook, Lepak stated it was a **"waste of police resources"** and that **"there is no cure for her."** These remarks were made while Lepak was a sitting public official and Chair of the Board of Health — the very official charged with safeguarding public health, including mental health.

97. By making such statements, Lepak demonstrated an animus toward individuals with
mental illness and a willingness to stigmatize them in public forums. Her statements
about Plaintiff and the other resident have caused severe reputational damage, emotional
distress, and reinforced false community perceptions that Plaintiff is unfit for public
engagement.

## 8. Destruction of Public Health Resources

98. Within one month of Plaintiff leaving the Board of Health, Lepak unilaterally deleted
public website resources he had created, including information on the 988 mental health
crisis line, health insurance enrollment, and senior assistance programs. The removal had
no legitimate purpose and deprived residents of important public health information,
evidencing retaliatory intent.

## 9. Comparator Evidence

99. Board of Health Vice Chair Christina Predella, Select Board members Brad Kadelski ,
Beth Coughlin and Richard Chafee all who received the same communications as Lepak,
did not seek a 258E order or endorse Lepak's allegations. This contrast supports the
inference that Lepak acted with personal animus and in retaliation for Plaintiff's
protected civic activity.

## VIII. POST-ORDER RETALIATION, ADA OBSTRUCTION, AND COORDINATED EXCLUSION BY TOWN OFFICIALS

100. After Defendants prevailed in obtaining 258E Harassment Prevention Orders in East Brookfield District Court on May 9, 2025—which included a court directive requiring the Town of Brookfield to provide public meeting access accommodations—the named Defendants, Campbell, Lepak and Simons, escalated a coordinated campaign to deny access, obstruct enforcement, and retaliate against Plaintiff for asserting his rights.

101. Defendants Maureen Lepak and Kimberly Simons testified under oath during the 258E hearings that they had no role in approving or denying ADA accommodations. Yet shortly afterward, both played a direct role in authoring the Board of Health's June 2025 official response to an Open Meeting Law complaint, which denied Plaintiff's accommodation request and claimed it *"demanded special treatment above and beyond what any other citizen would be granted."* The letter, signed by the Town Administrator, was ghostwritten by the Board of Health, showing active participation by Defendants Lepak and Simons in denying access contrary to their prior sworn claims.

102. Simultaneously, Select Board member Sarah Campbell, who also chairs the Cable Advisory Committee, refused to provide accommodations to her own meetings. Despite her leadership role and full knowledge of Plaintiff's disability and court-ordered access rights, Campbell engaged in tactics designed to evade enforcement, including voting to altering the Select Board's policy without notice, and shifting to a requirement that disabled residents must file new ADA accommodation requests for each individual

meeting, 48 hours in advance. This violates both the spirit and letter of federal accessibility law.

103. In one instance, a joint meeting between the Select Board (on which Campbell serves) and the Board of Health (chaired by Lepak) was posted exactly 48 hours and 3 minutes in advance, on a non-standard day and time, with no ADA accommodation instructions included in the meeting notice. This timing appears calculated to frustrate any timely request for accommodation, particularly by disabled citizens suffering from chronic illness or mental health impairments that impair executive function and timely responsiveness—exactly the class of people the ADA was enacted to protect.

104. At all relevant times, the Town of Brookfield had no designated Title II Coordinator, in direct violation of federal regulations. Only after repeated demands and ongoing litigation did the Town nominally appoint the Town Administrator to this role — the same official who, in writing, had previously denied Plaintiff's accommodation requests and excused differential treatment by stating:

*"…[the treatment] may appear to be different treatment to you but it is appropriate and equitable because of the fact that your remote participation as a result of your ADA accommodations request is, in fact, different from the usual 'in person' audience participation…"*

105. The Town has still refused to adopt the required grievance procedure, leaving no lawful mechanism for resolving ADA complaints and placing ADA enforcement authority in the hands of an alleged violator.

106. As a direct result of these tactics, Plaintiff has been excluded from one Annual Town Meeting and at least twenty-one (21) regular public board or committee meetings within a three-month period. Each exclusion compounds the harm already inflicted and further undermines Plaintiff's ability to participate in civic life, monitor government proceedings, and assert his rights. These exclusions are not isolated; they are part of a broader strategy of exclusion, retaliation, and procedural gamesmanship aimed at silencing a disabled and outspoken critic of Town governance.

107. The totality of these post-order actions shows that Defendants are not merely passive participants in a broken process. Rather, they are active architects of a coordinated scheme to use judicial orders as a pretext for exclusion, while undermining both state and federal access rights. Their conduct reflects a deliberate indifference to Plaintiff's constitutional rights, in violation of 42 U.S.C. § 1983, the ADA, and the Massachusetts Civil Rights Act.

## IX FALSE ACCUSATIONS, TARGETED PROVOCATION, AND DISABILITY-BASED DEFAMATION BY KAREN REYNOLDS

108. Defendant Karen Reynolds authored and submitted a written letter "at the request of several members of various town boards" in Brookfield, Massachusetts, for use in a G.L. c. 258E Harassment Prevention Order proceeding against Plaintiff.

35

109. Prior to the court hearing, Reynolds delivered the letter to Defendant Maureen Lepak, who produced it from her own file of papers in court. Lepak was not an attorney, court officer, or otherwise engaged in a privileged legal communication with Reynolds, making this an unprivileged publication to a third party.

110. On information and belief, Reynolds also provided or discussed the letter with one or more of the "several members of various town boards" referenced in her letter — including, upon information and belief, Defendants Kimberly Simons and Sarah Campbell — prior to the hearing, further publishing its defamatory contents outside any judicial proceeding.

111. The letter contained numerous false statements of fact, each designed to:

    A. discredit Plaintiff's reputation;

    B. portray him as dangerous or unstable;

    C. damage his credibility in civic and judicial settings; and

    D. aid a coordinated campaign to exclude him from public life.

110. **False Claim 1** – That Plaintiff "immediately yelled" at Reynolds before the June 11, 2024 Conservation Commission meeting.

111. **Evidence:** Body Worn Camera (BWC) footage, publicly posted YouTube recordings, and eyewitness accounts prove this did not occur. Plaintiff never spoke to Reynolds before the meeting.

112. **False Claim 2** – That Plaintiff yelled at Reynolds during the June 11, 2024 meeting after she asked a procedural question.

113. **Evidence:** Video evidence shows Plaintiff responded in a measured tone, limited to clarifying speaking rules within his role as Chair.

114. **False Claim 3** – That Plaintiff was aggressive toward Select Board Member Richard Chaffee, who was "sitting in his chair" when threatened with removal.

115. **Evidence:** Video from Lepak's own recording shows Chaffee repeatedly disrupted the meeting, ignored two warnings, and approached the Commission table before removal was requested.

116. **False Claim 4** – That Plaintiff "screamed" at Lepak in the foyer after the July 31, 2024 Board of Health meeting, and that Chaffee had to intervene.

117. **Evidence:** BWC footage shows Plaintiff leaving the Town Hall foyer quietly and without speaking to Lepak or Chaffee. The first interaction came when Reynolds herself accused Plaintiff of "abusing" his service dog, provoking a calm, non-threatening reply: "you are saying I abuse my dog? " "Then report it to the authorities."

118. **False Claim 5** – That it was "abuse for his dog (service animal) to have to listen to the screaming."

119. **Evidence:** This is a disability-based insult, equating a raised voice with animal abuse, and mirrors discriminatory reasoning that would accuse a blind person of abusing a guide dog merely by using it in public.

120. **False Claim 6** – That Plaintiff "files multiple complaints with the Attorney General …
sometimes as minor as a punctuation error."

121. **Evidence:** Plaintiff has never filed a complaint over punctuation. All complaints
addressed substantive violations, many upheld by the AG's Office.

122. **False Claim 7** – That Plaintiff "has multiple arrests: cocaine use, shoplifting, driving
with a suspended license, and possession of an illegal weapon."

123. **Evidence:** Plaintiff has never been arrested for "cocaine use." "Use" is not a
Massachusetts criminal charge, and the phrasing was deliberately chosen over
"possession" to maximize reputational harm.

124. **False Claim 8** – That Plaintiff wrote his mental health was being "wrecked" and he is
"a threat to certain board members."

125. **Evidence:** This quote was lifted from Plaintiff's confidential ADA accommodation
request dated April 25, 2025, which was sent to Town officials and counsel. Reynolds
mischaracterized it to portray Plaintiff as unstable and dangerous.

126. **Verbal False Claim** – That Plaintiff "abuses that dog," made in front of the Molasses
Hill group while Plaintiff was quietly exiting Town Hall on July 31, 2024.

127. **Evidence:** BWC footage shows Plaintiff leaving calmly without speaking to anyone
before the remark. Reynolds then altered her statement to "I believe he abuses the dog,"
admitting it was opinion without factual basis.

128. These statements are defamatory per se because they impute criminal conduct, unethical behavior, and serious mental illness, all made with actual malice and reckless disregard for the truth.

## COUNT I – FIRST AMENDMENT RETALIATION UNDER 42 U.S.C. § 1983

*(Against Sarah Campbell; Maureen Lepak; Kimberly Simons individual capacities (damages) )*

129. Plaintiff realleges and incorporates by reference all prior paragraphs as if fully set forth herein.

130. The First Amendment to the United States Constitution, as incorporated against the states through the Fourteenth Amendment, protects citizens' rights to freedom of speech, political expression, press, petitioning the government, and access to public forums.

131. At all relevant times, Plaintiff engaged in core First Amendment activity, including:

   A. Distributing political flyers criticizing public officials;

   B. Submitting Open Meeting Law complaints;

   C. Filing Open Records Requests (FOIA)

   D. Running political campaign(s)

   E. Contacting the press to expose alleged misconduct;

   F. Publishing videos and commentary on YouTube and other platforms.

132. In retaliation for this protected activity, Defendants Campbell, Lepak, and Simons:

A. Filed or supported meritless harassment prevention orders under G.L. c. 258E;

B. Publicly cited the existence of those orders to damage Plaintiff's reputation;

C. Mischaracterized Plaintiff's ADA-related communications to suggest dangerousness;

D. Disseminated defamatory statements about Plaintiff's conduct at public meetings.

133. These acts were undertaken under color of law and/or in active coordination with municipal government actors and systems.

134. The Town of Brookfield, by and through its Select Board, administrative staff, and legal counsel, ratified and enabled this campaign of retaliation by:

A. Enforcing unlawful exclusions from public meetings;

B. Ignoring the May 9, 2025 court-ordered accommodation;

C. Publishing or validating defamatory narratives about Plaintiff's fitness, behavior, and service dog.

135. Defendants' actions would chill a person of ordinary firmness from continuing to engage in protected speech and were intended to deter Plaintiff from such speech.

136. As a direct and proximate result of this retaliation, Plaintiff suffered:

A. Loss of civil rights and civic access;

B. Reputational damage and emotional distress;

C. Impairment of his ability to engage in political and legal advocacy.

137. Defendants' conduct violated Plaintiff's First and Fourteenth Amendment rights and constitutes actionable retaliation under 42 U.S.C. § 1983.

**WHEREFORE,** Plaintiff requests that the Court enter judgment in his favor and against Defendants Campbell , Lepak and Simons;

A. compensatory damages,

B. punitive damages, and

C. all other relief deemed just and proper

## COUNT II – VIOLATION OF THE MASSACHUSETTS CIVIL RIGHTS ACT (M.G.L. C. 12, §§ 11H–11I)

*(Against Campbell, Lepak, Simons, and Reynolds Individual capacities only)*

138. Plaintiff realleges and incorporates by reference all prior paragraphs as if fully set forth herein.

139. Massachusetts Civil Rights Act ("MCRA"), G.L. c. 12, §§ 11H–11I, prohibits any person, whether acting under color of law or as a private party, from interfering or attempting to interfere with the exercise or enjoyment of secured rights by threats, intimidation, or coercion.

140. At all relevant times, Plaintiff exercised or attempted to exercise rights guaranteed by the United States Constitution, the Massachusetts Constitution, the Massachusetts Open Meeting Law, the Americans with Disabilities Act, and the Massachusetts Public Records Law, including rights to:

    A. Speak and distribute political materials critical of government officials;

    B. Petition for redress of grievances;

    C. Attend and participate in public meetings;

    D. Seek and obtain public records;

    E. Run campaigns and participate in local elections; and

    F. Obtain ADA-compliant accommodations for civic access.

141. In retaliation for Plaintiff's exercise of these rights:

    A. Defendants Campbell, Lepak, and Simons initiated and/or supported meritless petitions for Harassment Prevention Orders under G.L. c. 258E, mischaracterizing protected political speech and lawful ADA-related communications as personal harassment;

    B. Defendant Reynolds, acting in concert with these Defendants and at their request, submitted a letter containing multiple false and defamatory statements, including accusations designed to portray Plaintiff as dangerous, unfit for public interaction, and emotionally unstable; and

C.  All Defendants coordinated the timing and use of these filings with pending

litigation and the May 2025 municipal election, intending to impair Plaintiff's

political viability and civic participation.

142. The Town of Brookfield, through its Select Board, administrative officials, and legal

counsel, ratified and perpetuated this campaign by:

A.  Publicly citing the 258E orders in legal and political contexts to discredit Plaintiff;

B.  Refusing to implement or honor the May 9, 2025 court-ordered accommodation for

civic access; and

C.  Continuing to deny Plaintiff physical and remote access to public meetings.

143. This conduct constitutes "threats, intimidation, or coercion" within the meaning of G.L.

c. 12, § 11H, in that it sought to compel Plaintiff to forgo the exercise of his protected

rights through fear of judicial sanction, reputational harm, exclusion from public forums,

and political disenfranchisement.

144. As a direct and foreseeable result of Defendants' actions, Plaintiff suffered substantial

harm, including but not limited to reputational injury, emotional distress, restricted access

to public forums, and loss of fair electoral and legal processes.

**WHEREFORE,** Plaintiff requests that the Court enter judgment in his favor and against

Defendants Campbell , Lepak , Simons , Karen Reynolds in their Individual Capacities Only for;

A. compensatory damages,

B. punitive damages, and

C. all other relief deemed just and proper

## COUNT III – ABUSE OF PROCESS

*(Against Campbell, Lepak, Simons, and Reynolds Individual capacities only)*

145. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

146. The Massachusetts Harassment Prevention Order statute, G.L. c. 258E, is a remedial measure intended to protect individuals from genuine harassment—defined as a pattern of serious acts serving no legitimate purpose. It is not a tool for political suppression, personal vendettas, or the obstruction of lawful civic activity.

147. Defendants Campbell, Lepak, Simons, and Reynolds, acting individually and in concert, knowingly initiated or materially supported 258E petitions for purposes wholly unrelated to the statute's protective function. These purposes included:

A. Silencing a known critic of Town governance;

B. Gaining political advantage in the May 2025 municipal election;

C. Obstructing Plaintiff's pending legal actions; and

D. Weaponizing judicial process to retaliate against Plaintiff's protected speech and petitioning activity.

148. Each petition was filed only after Plaintiff engaged in core civic activity protected by the Massachusetts and United States Constitutions, including public criticism of elected officials, participation in open government meetings, filing Open Meeting Law and public records complaints, and submitting ADA accommodation requests.

149. Defendants then exploited the existence of the 258E orders to:

   A. Mischaracterize Plaintiff as a public safety threat;

   B. Justify exclusion from public meetings and election forums;

   C. Intimidate Plaintiff into refraining from further public participation; and

   D. Introduce tainted or misleading narratives into unrelated administrative and judicial proceedings.

150. The process was used not to obtain legitimate protective relief, but to achieve objectives that could not lawfully be secured through political, administrative, or judicial means, including:

   A. Interfering with Plaintiff's ADA enforcement efforts;

   B. Sabotaging his political campaigns;

   C. Chilling his public speech; and

   D. Undermining his access to redress mechanisms and public forums.

151. As a direct and foreseeable result, Plaintiff suffered substantial injury, including:

    A. Violation of his civil and constitutional rights;

    B. Severe reputational damage;

    C. Exclusion from civic forums and public meetings;

    D. Suppression of his online speech platforms; and

    E. Significant emotional distress.

152. Defendants' misuse of G.L. c. 258E was deliberate, malicious, and coordinated, constituting abuse of process under Massachusetts law.

153. **Limitation of Claim:** For avoidance of doubt, Plaintiff does not in this Count seek review, modification, or vacatur of any harassment prevention order issued under G.L. c. 258E. Plaintiff's Abuse of Process claim is limited to Defendants' initiation and use of such proceedings for ulterior, retaliatory purposes unrelated to any legitimate protective function, and the collateral consequences of those actions on Plaintiff's constitutional and statutory rights.

**WHEREFORE,** Plaintiff requests that the Court enter judgment in his favor and against Defendants Campbell , Lepak , Simons and Karen Reynolds for;

    A. compensatory damages,

    B. punitive damages, and

    C. all other relief deemed just and proper

## COUNT IV – LIBEL AND SLANDER (DEFAMATION)

*(Against Maureen Lepak Individual capacity only)*

154. Plaintiff re-alleges and incorporates by reference all preceding paragraphs, including the detailed factual allegations in Section [7] of the Factual Background, as if fully set forth herein.

155. Under Massachusetts law, a defendant is liable for defamation where they: (a) published a statement of fact to a third party, (b) of and concerning the plaintiff, (c) that was false, (d) with fault amounting at least to negligence, and (e) which caused damages. Statements are defamation per se when they falsely impugn a person's profession, business, or fitness for office.

156. Acting both individually and under color of law as Chair of the Brookfield Board of Health, Defendant Lepak published multiple false and defamatory statements about Plaintiff to third parties, including state agencies, members of the public, and other governmental entities.

157. These statements were made:

    A. In official written communications bearing the Town of Brookfield seal and Lepak's title, to regulatory agencies including the Massachusetts Department of Environmental Protection (MassDEP), the Massachusetts Division of Fisheries and Wildlife, and the Cannabis Control Commission (CCC);

B. In Board of Health meeting minutes published on official Town platforms and later republished to third-party websites; and

C. In public online posts and oral statements to members of the public and other officials.

157. In these publications, Lepak falsely asserted, among other things, that:

A. Plaintiff's business was not located at a legitimate address;

B. Plaintiff's nonprofit provided "no services" (despite documented housing assistance to homeless residents, including one whose life was likely saved during a winter cold snap);

C. Plaintiff's prior businesses had been "dissolved by court order" (false and unsupported); and

D. Plaintiff was "upset" at not being given a title (a statement the Massachusetts Attorney General's Division of Open Government reviewed, found false based on the meeting audio, and ordered corrected).

158. Despite the Attorney General's ruling and Plaintiff's cease-and-desist letter, Lepak knowingly republished the false minutes on a third-party website — an act that satisfies the "actual malice" standard because she did so with knowledge of falsity and with the intent to harm Plaintiff's reputation.

159. Lepak also publicly posted on Facebook that Plaintiff has "severe mental health issues," a statement that is both false and stigmatizing. As Chair of the Board of Health, Lepak's public speculation about a resident's mental health status reflects reckless disregard for the truth and constitutes defamation per se by impugning Plaintiff's fitness for public participation and office.

160. In another public online post, Lepak mocked a different Brookfield resident in the midst of a mental health crisis, stating it was a "waste of police resources" and that "there is no cure for her." These statements demonstrate Lepak's animus toward individuals with mental illness and provide further evidence of her reckless disregard for the truth when making mental-health-based accusations against Plaintiff.

161. The Defendant Lepak's defamatory conduct was the subject of a formal cease-and-desist letter, which was served on both her and the Town's leadership.

162. Lepak acted under color of her official role when making the statements in official emails, meeting minutes, and formal complaints.

163. The Town's leadership, by failing to take corrective action and by allowing its official platforms to host or republish the false statements, ratified and perpetuated her conduct. The statements identified above are defamatory per se because they:

   A. Charge Plaintiff with conduct incompatible with the proper exercise of his profession and public service;

   B. Impugn his honesty, integrity, and competence in civic matters; and

C. Falsely suggest unlawful or unethical conduct.

163. Upon information and belief, Defendant Lepak's defamatory republication of the false
meeting minutes, as well as her false written statements to outside agencies, were further
informed by confidential disability-related information from Plaintiff's April 23, 2025
ADA accommodation request. This email was sent exclusively to Town officials and
legal counsel, contained sensitive information regarding Plaintiff's C-PTSD, and was
protected under Section 504 of the Rehabilitation Act and Title II of the ADA. The
disclosure of this protected communication — whether directly to Lepak or through
shared access within the Town — allowed Lepak to frame her defamatory statements in a
manner designed to portray Plaintiff's disability as instability and to discredit his
protected civic activities. This use of confidential ADA information was made with actual
malice and in furtherance of the coordinated retaliation campaign described herein.

164. Lepak acted with **actual malice,** in that she knew the statements were false (or acted in
reckless disregard for their truth) and published them for the ulterior purpose of
damaging Plaintiff's reputation, interfering with his business relationships, undermining
his ADA rights, and silencing his public speech.

165. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered
reputational harm, economic losses, emotional distress, loss of professional and civic
opportunities, and other damages to be proven at trial.

**WHEREFORE,** Plaintiff requests that the Court enter judgment in his favor and against
Defendants Lepak and the Town of Brookfield for;

    A.  compensatory damages,

    B.  punitive damages, and

    C.  all other relief deemed just and proper.

## COUNT V – LIBEL AND SLANDER (DEFAMATION)

*(Against Defendant Karen Reynolds in her Individual Capacity)*

    166. Plaintiff re-alleges and incorporates all prior paragraphs as if fully set forth herein.

## I. Applicable Legal Standards

    167. Under Massachusetts law, defamation encompasses both libel (written) and slander (spoken). To establish a prima facie case, a plaintiff who is not a public figure must show:

        A.  The defendant made a false statement of fact about the plaintiff to a third party;

        B.  The statement was defamatory in nature, tending to harm the plaintiff's reputation in the community;

        C.  The defendant was at least negligent in making the statement; and

        D.  The plaintiff suffered damages as a result.

   *See White v. Blue Cross & Blue Shield of Mass., Inc., 442 Mass. 64, 66–67 (2004).*

    168. Where the plaintiff proves by clear and convincing evidence that the defendant acted with "actual malice" — knowledge of falsity or reckless disregard for truth — punitive

damages may be awarded. *See Stone v. Essex County Newspapers, Inc., 367 Mass. 849, 867 (1975).*

169. Statements imputing criminal conduct, unethical behavior in one's profession, or serious mental illness are considered defamation per se, actionable without proof of special damages.

## II. Defendant's Defamatory Conduct

170. Defendant Reynolds' letter was deliberately published outside any judicial proceeding, including pre-hearing delivery to Defendant Lepak and, on information and belief, to other town officials, for the purpose of causing maximum reputational harm and aiding a coordinated campaign to discredit Plaintiff.

171. **Unprivileged Publication** – Defendant Reynolds delivered the letter to Defendant Lepak prior to the court hearing in which it was used. At the hearing, Defendant Lepak produced the letter from her own file of papers, confirming that Reynolds had provided it to her in advance and outside the presence of the court. Lepak was not an attorney, court officer, or otherwise engaged in a privileged legal communication with Reynolds at that time. This constitutes unprivileged publication to a third party.

172. **Additional Pre-Hearing Distribution** – Defendant expressly stated in her letter that she was "writing this at the request of several town officials," confirming that the defamatory statements were not an independent account but part of a coordinated effort by multiple officials to harm Plaintiff's reputation and influence judicial proceedings. On

information and belief, before delivering the letter to Lepak, Reynolds also provided it to, or discussed its contents with, one or more of the "several members of various town boards" referenced in the letter — including, upon information and belief, Defendants Simons and Campbell — thereby publishing its defamatory statements to additional third parties outside any judicial proceeding or privileged context.

173. **False Statements and Per Se Categories** – The letter was replete with falsehoods, so numerous and sweeping in scope that they appear deliberately crafted to cause the maximum possible impact on the court's perception of Plaintiff. These included, but were not limited to, the following:

174. That Plaintiff yelled at her "just for asking a question" before and during a public meeting — **false**, and disprovable by public meeting recordings; no such incident occurred.

175. That Plaintiff yelled at Defendant Lepak and that Select Board Member Chaffee had to distract Plaintiff so Lepak could escape — **false**, disprovable by body-worn camera (BWC) footage; no such conduct occurred.

176. That Plaintiff abuses his service dog — **false,** defamatory per se as it imputes criminal animal abuse; disproven by BWC footage showing calm demeanor.

177. That Plaintiff has been arrested for cocaine "use" — **false,** defamatory per se as it imputes criminal conduct; "cocaine use" is not a Massachusetts criminal charge, and Plaintiff has never been arrested for it.

178. That Plaintiff behaved in a threatening or intimidating manner toward her — **false,** contradicted by BWC and video evidence; no threatening behavior occurred.

179. That Plaintiff's mental health was being "wrecked" and he is "a threat to certain board members" — **false,** taken out of context from a confidential ADA accommodation request to portray Plaintiff as unstable and dangerous.

180. **Knowledge of Falsity** – Each of these statements was materially false and easily disprovable by publicly available meeting videos, police records, and BWC footage. Defendant either knew her statements were false or acted with reckless disregard for their truth, as she had ready access to this public evidence and could have reviewed it before making accusations.

181. **Improper Use of Confidential ADA Information** – Upon information and belief, portions of Defendant Reynolds' defamatory letter — including the verbatim phrase "mental health is being wrecked" — were taken directly from Plaintiff's confidential ADA accommodation request dated April 25, 2025. This email was sent to Town officials and legal counsel and contained sensitive disability-related information protected by Section 504 of the Rehabilitation Act and Title II of the ADA. Defendant Reynolds could not have obtained this language except through an unlawful disclosure by one or more Town officials. The inclusion of this private, federally protected information in Reynolds' letter amplified its defamatory impact by portraying Plaintiff's disability as instability, and caused further harm by undermining Plaintiff's credibility in all ADA-related matters before the Town and the court.

182. Defendant's conduct meets the criteria for actual malice, as her statements were made in furtherance of a coordinated campaign, contained demonstrably false factual claims, and were designed to damage Plaintiff's reputation and standing in the community.

## III. Harm to Plaintiff

183. As a direct and proximate result of Defendant's defamatory statements, Plaintiff has suffered:

    A. Severe reputational harm and stigmatization within the Brookfield community;

    B. Emotional distress, humiliation, and mental anguish;

    C. Economic loss from diminished business and civic opportunities; and

    D. The ongoing use of false allegations to justify exclusion from public participation.

**WHEREFORE,** Plaintiff requests that the Court enter judgment in his favor and against Defendant Karen Reynolds for

    A. compensatory damages,

    B. punitive damages, and

    C. all other relief deemed just and proper.

## COUNT VI – CIVIL CONSPIRACY (COMMON LAW)

*(Against Defendants, Sarah Campbell, Maureen Lepak Kimberly Simons and Karen Reynolds Individual capacities only)*

184. Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

185. Under Massachusetts common law, civil conspiracy exists where two or more persons act in concert with a common design to commit a tort, or where they agree to perform a lawful act by unlawful means. *See Kurker v. Hill, 44 Mass. App. Ct. 184, 188 (1998).* The "common design" form requires proof that the defendants shared a plan to commit the underlying wrongful acts and acted in furtherance of that plan, resulting in harm to the plaintiff. The "concerted action" form requires proof that the defendants acted together, with each playing an active role, such that they may be held jointly liable for the tortious acts of the others.

186. **First Meeting of the Minds – Coordinated Courthouse Filings:** On April 25, 2025, Defendants Lepak, Campbell, and Simons each filed handwritten G.L. c. 258E harassment prevention petitions, all bearing the identical Brookfield District Court filing time of 10:02 a.m. The handwritten nature of the documents makes it a practical impossibility for three individuals to independently obtain, complete, and file such petitions at the exact same minute without prior coordination. This identical timing is circumstantial evidence of a pre-existing agreement and shared intent to act in concert for the improper purpose of misusing the judicial process to retaliate against Plaintiff..

187. This first meeting of the minds occurred immediately after Plaintiff:

56

A. Sent two formal ADA accommodation requests to the Board of Health;

B. Delivered a final ADA legal demand letter warning of imminent litigation and personal liability; and

C. Maintained an active MCAD complaint against Defendant Lepak.

188. The close temporal proximity between Plaintiff's protected activities and the synchronized filings demonstrates that these Defendants coordinated their courthouse appearance and acted with the unlawful objective of misusing judicial process to retaliate against Plaintiff and suppress his civic participation.

189. **Second Meeting of the Minds – Karen Reynolds Letter** Separate from the courthouse coordination, Defendant Reynolds admitted in her own letter that she authored it "at the request of several town officials." The letter contained numerous provably false allegations, including language taken verbatim from Plaintiff's confidential ADA accommodation request — a communication never sent to Reynolds.

190. The inclusion of this confidential ADA language shows that at least one Defendant disclosed protected disability-related information to Reynolds for the purpose of portraying Plaintiff as unstable and dangerous. Reynolds then delivered the letter to Defendant Lepak, who introduced it in court to bolster the coordinated 258E proceedings.

191. This second meeting of the minds involved the unlawful recruitment of an outside actor to generate false evidence and inject confidential ADA information into a judicial proceeding, furthering the same retaliatory objectives as the courthouse filings.

**Application to Defendants;**

192. Sarah Campbell benefited by suppressing video and online content documenting her policy violations, coercing Plaintiff into removing his public accountability platform under threat of arrest, and preventing the filing of further Open Meeting Law complaints —an outcome she had previously stated, in public, that she desired.

193. Maureen Lepak benefited by eliminating ADA-based oversight of her Board of Health meetings, using her Town title and seal to defame Plaintiff to regulatory agencies, and republishing minutes already adjudicated false by the Attorney General. She further benefited by incorporating the 258E harassment prevention order into her official MCAD response to discredit Plaintiff's discrimination claims, and by repeatedly citing the 258E order in her responses to Open Meeting Law complaints to evade accountability and deflect scrutiny.

194. **Kimberly Simons** benefited by halting oversight of her board, shielding herself from scrutiny over repeated ADA denials, and providing political cover to allied officials engaged in similar misconduct. Simons also shared geographic proximity and political alignment with Karen Reynolds, residing only a few houses away and opposing the same development project that served as a flashpoint for their hostility toward Plaintiff.

195. **Karen Reynolds** knowingly acted in concert with these officials by preparing a defamatory letter at their request, filling it with provable falsehoods to cause maximum reputational harm, and attending court when it was introduced so she could witness its use against Plaintiff. Reynolds also had an independent personal motive to target Plaintiff

because Plaintiff's associate was developing a licensed cannabis cultivation business near Reynolds' property — a project to which Reynolds was publicly opposed. This pre-existing animus aligned with the political and retaliatory motives of Campbell, Lepak and Simons, making Reynolds a willing and active participant in the coordinated campaign against Plaintiff.

196. Overt Acts in Furtherance of the Conspiracy

    A. Coordinated filing of 258E petitions.

    B. Solicitation and republication of defamatory material from a private actor.

    C. Dissemination of adjudicated false statements.

    D. Unlawful disclosure of Plaintiff's confidential ADA request to a third party for use in a retaliatory proceeding.

197. Each Defendant's actions were not isolated but part of an orchestrated scheme. The shared objective was to silence Plaintiff, destroy his credibility, prevent further exposure of official misconduct, and deter others in the community from engaging in similar civic participation.

198. These coordinated actions created a chilling effect on civic engagement in Brookfield, sending the clear message that residents — especially those with disabilities — who challenge Town officials will be punished through court process, public shaming, and exclusion.

**WHEREFORE ,** Plaintiff requests that the Court enter judgment in his favor and against

Defendants Campbell, Lepak, Simons, and Reynolds, jointly and severally, for;

    A. compensatory damages,

    B. punitive damages, and

    C. all other relief deemed just and proper.

**COUNT VII – VIOLATION OF SECTION 504 OF THE REHABILITATION ACT AND TITLE II OF THE AMERICANS WITH DISABILITIES ACT (UNAUTHORIZED DISCLOSURE OF CONFIDENTIAL ADA COMMUNICATION AND RETALIATION)**

*(Against Defendant Town of Brookfield; Pled as a Standalone Claim and Also in the Alternative to Counts VIII and IX). See also factual allegations in Count V, incorporated herein*

**Legal Standard**

199. Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, prohibits discrimination against an otherwise qualified individual with a disability by any program or activity receiving federal financial assistance. Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132, similarly prohibits public entities from excluding qualified individuals with disabilities from participation in or denying them the benefits of services, programs, or activities.

200. Both statutes impose:

    A. An affirmative obligation to provide reasonable accommodations to ensure equal participation; and

B. A duty to maintain the confidentiality of disability-related communications and records.

206. Retaliation against an individual for asserting rights under the ADA or Section 504 is independently prohibited. See 28 C.F.R. § 35.134(a);

**Per Se Violation**

207. Federal regulations make clear that the unauthorized disclosure of confidential disability-related information is, by itself, a violation of Section 504 and Title II — regardless of whether further harm is shown. See 28 C.F.R. § 35.130(h) (public entities must safeguard the privacy of individuals with disabilities in the handling of personal information). Because this duty is absolute, Defendants' disclosure of Plaintiff's ADA communication is actionable per se and not subject to any "harmless error" defense.

**Application to Defendants**

208. Plaintiff re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

209. Plaintiff is a qualified individual with a disability within the meaning of Section 504 and Title II. Plaintiff's C-PTSD substantially limits one or more major life activities, including the ability to speak under stress, process information, and participate in public meetings. He has repeatedly requested accommodations to ensure full and equal access to Brookfield's public programs and meetings.

210. On or about April 23, 2025, Plaintiff submitted a confidential ADA accommodation request to Town officials and the Town's legal counsel. The request explicitly invoked the

61

ADA and described how Plaintiff's disability impacted his ability to attend and participate in public meetings. It included sensitive mental health history, specifically stating that his "mental health is being wrecked" by ongoing barriers and retaliation.

211. This email was sent to Town officials and counsel, with an expectation of confidentiality as required by federal law.

212. Despite that duty, one or more Defendants—acting individually or in concert— unlawfully disclosed the contents of Plaintiff's confidential ADA accommodation request to Defendant Karen Reynolds, a known political adversary and private third party. Reynolds could not have obtained this information through lawful means. Her subsequent character letter not only reproduced the ***exact phrase*** "mental health is being wrecked" verbatim from Plaintiff's written request, but also expressly attributed it to "Kelleher wrote," demonstrating that she knew it was taken directly from Plaintiff's written communication.

213. The disclosure served no legitimate governmental purpose. Instead, it was made to:

   A. Smear Plaintiff's credibility;

   B. Solicit defamatory material for use in pending harassment prevention proceedings; and

   C. Create a pretext for excluding Plaintiff from public forums.

214. Upon information and belief, Defendants Lepak, Campbell, and/or Simons either directly provided the confidential email to Reynolds or caused its substance to be

conveyed to her. This was done with knowledge that Reynolds would use it to harm

Plaintiff and with the intent to chill his future ADA requests.

## Chilling Effect on Other Disabled Residents

215. The damage from this disclosure extends beyond Plaintiff. By demonstrating that the

Town of Brookfield will share private ADA requests with private citizens to be used as

weapons in court or in political disputes, Defendants have created a ***chilling effect*** on ***all***

residents with disabilities. Any disabled resident who might otherwise request an

accommodation must now fear that their confidential communications will be disclosed

to adversaries, used to embarrass them publicly, or leveraged against them in unrelated

disputes. This practice undermines the very purpose of the ADA and Section 504 — to

encourage, not discourage, the use of accommodations to achieve equal participation in

civic life.

## Integration with Coordinated Retaliation Scheme

216. The disclosure of Plaintiff's ADA email was not an isolated act. It occurred within the

same April–May 2025 time frame as the Defendants' coordinated campaign of retaliation,

which included the misuse of G.L. c. 258E harassment prevention orders, public

defamation, and exclusion from civic forums. The release of Plaintiff's private disability

information to Reynolds provided fresh material for that campaign, bolstering false

narratives and increasing the likelihood of judicial and public hostility toward Plaintiff.

**WHEREFORE,** Plaintiff requests that the Court enter judgment in his favor and against Defendants Town of Brookfield, Lepak, Campbell, and Simons, jointly and severally, for;

      A. compensatory damages,

      B. punitive damages,

      C. injunctive relief requiring confidentiality safeguards for ADA communications,

      D. declaratory relief that such disclosures are unlawful, and

      E. all other relief deemed just and proper.

## COUNT VIII – VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT (42 U.S.C. § 12131 et seq.)

*(Against Defendant Town of Brookfield; Pled in the Alternative to Count VII and to Preserve Independent Title II Grounds)*

217. Plaintiff realleges and incorporates all prior paragraphs.

218. **1. Statutory Protection.** Title II of the ADA, 42 U.S.C. § 12132, provides that *"no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."* Under 28 C.F.R. § 35.107(a), public entities must designate an ADA Title II coordinator and adopt grievance procedures to resolve complaints.

219. **2. Qualified Individual.** Plaintiff is a qualified individual with a disability. His C-PTSD substantially limits major life activities including verbal expression, cognitive processing, memory, and civic engagement under stress. The Town has long been aware of this disability and of Plaintiff's documented need for accommodations.

220. **3. Public Entity.** The Town of Brookfield is a "public entity" within the meaning of 42 U.S.C. § 12131(1). Defendants Campbell, Lepak and Simons, are sued in their official capacities as Town officials responsible for implementing or enforcing meeting access policies.

221. **4. Accommodation Requests.** On multiple occasions — including April 22 and May 12, 2025 — Plaintiff submitted written requests for reasonable accommodations, including:

   A. Continued remote access to public meetings via the same Teams link;

   B. Protection against arbitrary muting or targeted speaking-time enforcement;

   C. Equal opportunity to participate in public comment without disability-based interruption; and

   D. Assurance of compliance with court-ordered accommodations issued under G.L. c. 258E.

222. **5. Unlawful Denial.** Instead of granting these accommodations or engaging in the interactive process, the Town and its officials:

A. Implemented a 48-hour "per meeting" notice requirement that effectively blocked access to meetings posted just minutes over the 48 hours' notice;

B. Prohibited "blanket" ADA requests, despite having previously approved one for Plaintiff;

C. Failed to notify Plaintiff of the policy change and then denied him access to multiple Select Board, Board of Health, Cable Advisory Committee, and Advisory Committee meetings;

D. Justified denial by stating Plaintiff's requests demanded "more than any other citizen would be granted" — a standard contrary to the ADA's mandate for individualized modification; and

E. Ignored a standing court order requiring accommodations to avoid using a harassment prevention order as a bar to public participation.

223. Deliberate Indifference. The Town and its officials acted with deliberate indifference by:

A. Receiving repeated written requests referencing the ADA;

B. Refusing to provide any written denial, explanation, or offer of alternatives;

C. Continuing the exclusion after Plaintiff provided notice of the discrimination; and

D. Posting meetings 48 hours and 1 or 3 minute(s) in advance , while requiring 48 hour notice from disable citizens

    E. Maintaining a policy that foreseeably and actually prevented disabled residents from attending or participating in meetings.

224. Injury. As a direct and proximate result of these actions, Plaintiff suffered:

    A. Exclusion from meetings addressing matters directly affecting his rights and interests;

    B. Loss of equal opportunity to speak, petition, and advocate;

    C. Emotional distress, reputational harm, and worsening of disability symptoms; and

    D. A chilling effect on his and other residents' willingness to request accommodations.

**WHEREFORE,** Plaintiff requests that the Court enter judgment in his favor and against Defendants, awarding:

    A. Compensatory damages;

    B. Declaratory relief that the Town's policies and practices violate Title II;

    C. Injunctive relief prohibiting further discrimination and requiring lawful accommodation policies;

    D. Attorney's fees and costs pursuant to 42 U.S.C. § 12205; and

    E. Such other relief as the Court deems just and proper.

**Statutory Overlap and Independent Grounds for Relief**

The obligations imposed on the Town of Brookfield and its officials under Title II of the ADA and Section 504 of the Rehabilitation Act are similar but legally distinct. Both statutes prohibit disability-based exclusion from participation in public programs and activities, require reasonable modifications to ensure equal access, and forbid retaliation against individuals who assert their rights. However, Section 504 applies specifically to entities receiving federal financial assistance, while Title II applies to all public entities regardless of funding source. The violations set forth herein independently satisfy the elements of each statute. Even if one statutory claim were found deficient, the facts alleged state a viable cause of action under the other, ensuring separate and alternative grounds for relief

**COUNT IX – VIOLATION OF SECTION 504 OF THE REHABILITATION ACT (29 U.S.C. § 794)**

*(Against Defendant Town of Brookfield; Pled in the Alternative to Count VII and to Preserve Independent § 504 Grounds)*

225. Plaintiff realleges and incorporates all prior paragraphs.

226. **1. Statutory Protection.** Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), provides that *"No otherwise qualified individual with a disability in the United States… shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."*

227. **2. Qualified Individual**. Plaintiff is an individual with a disability as defined by Section 504. His C-PTSD substantially limits major life activities including verbal expression, memory, and civic engagement under stress.

228. **3. Covered Entity.** The Town of Brookfield is a public entity that receives federal financial assistance, including but not limited to American Rescue Plan Act (ARPA) funds, municipal block grants, and state-federal aid for public health and civic administration. Its programs and activities — including Select Board, Board of Health, and committee meetings — are subject to Section 504.

229. **4. Accommodation Requests.** Plaintiff repeatedly requested reasonable modifications to enable full participation in these programs, including:

    A. Standing remote access to public meetings;

    B. Protection against targeted muting or selective enforcement of speaking limits;

    C. Equal opportunity to comment during public participation periods; and

    D. Compliance with a court-ordered accommodation under G.L. c. 258E to prevent misuse of a harassment prevention order as a barrier to access.

230. **5. Unlawful Denial.** The Town and its officials willfully refused to accommodate Plaintiff's disability by:

    A. Reversing a previously approved blanket ADA accommodation without notice;

B. Imposing a 48-hour "per meeting" notice requirement that effectively barred access to meetings posted with less than 48 hours' or just over the 48 hours' notice;

C. Denying Plaintiff access to multiple public meetings, including **all Board of Health,** Select Board, Cable Advisory Committee, and Advisory Committee meetings in April, May, June and July 2025, as well as the Annual Town Meeting and Select Board meetings where Plaintiff's rights and interests were directly affected. Notably, on two occasions, the Board of Health provided remote access to one of its own members, Defendant Kimberly Simons, yet refused to provide the same access to Plaintiff. Plaintiff's requests required nothing more than emailing him the same meeting link — a minimal action the Board nevertheless denied, stating he was "asking for more than any other citizen would get."

D. Title II of the ADA, 42 U.S.C. § 12132, requires public entities to ensure that qualified individuals with disabilities have an equal opportunity to participate in or benefit from public services, programs, and activities. By granting remote access to Simons while denying it to Plaintiff — despite his request being identical in substance and grounded in a documented ADA accommodation — the Town engaged in discriminatory treatment in violation of Title II's equal participation mandate

E. Justifying denial with the statement that Plaintiff's requests demanded "more than any other citizen would be granted," a discriminatory standard contrary to Section 504; and

F. Failing to respond in writing or engage in any interactive process despite repeated written notice.

231. **6. Deliberate Indifference and Retaliation.** Defendants acted with deliberate indifference by ignoring clear legal obligations under Section 504 and by adopting policies that foreseeably and actually excluded disabled residents from civic participation. These actions also had a retaliatory purpose — discouraging Plaintiff from continuing to assert disability rights and chilling other residents from making similar requests for fear their communications could be disclosed or used against them.

232. **7. Injury.** As a direct and proximate result of Defendants' actions, Plaintiff suffered:

A. Exclusion from meetings and denial of equal civic participation;

B. Emotional distress and exacerbation of disability symptoms;

C. Reputational harm; and

D. Loss of statutory and constitutional rights.

**WHEREFORE,** Plaintiff requests that the Court enter judgment in his favor and against Defendants, awarding:

A. Compensatory damages;

B. Declaratory relief that the Town's policies and practices violate Section 504;

C. Injunctive relief prohibiting further discrimination and requiring lawful accommodation policies;

D. Attorney's fees and costs pursuant to 29 U.S.C. § 794a(b); and

E. Such other relief as the Court deems just and proper.

## COUNT X – VIOLATION OF COURT-ORDERED ACCOMMODATIONS UNDER G.L. C. 258E; INTERFERENCE WITH CONSTITUTIONAL RIGHTS (MASSACHUSETTS CIVIL RIGHTS ACT, G.L. C. 12, §§ 11H–11I; 42 U.S.C. § 1983)

*(Against Campbell, Lepak, and Simons in their Individual Capacities on §1983 for damages Town (injunctive/declaratory relief).) and Violation of the Massachusetts Civil Rights Act, G.L. c. 12, §§ 11H–11I (Against Defendants Campbell, Lepak, and Simons in their Individual Capacities only)*

233. Plaintiff realleges and incorporates all prior paragraphs.

234. On May 9, 2025, the East Brookfield District Court, in the matter of Campbell v. Kelleher , Lepak v. Kelleher and Simons v. Kelleher Docket No. 2569RO(H)000122, 123 and 124 issued a specific directive pursuant to G.L. c. 258E requiring that Plaintiff be provided remote access to Brookfield public meetings in order to prevent the Harassment Prevention Order ("HPO") from unlawfully excluding him from public participation.

235. These orders were clear, mandatory, and enforceable: Plaintiff's ability to attend public meetings remotely was a court-imposed accommodation intended to ensure that the HPO could not be misused as a tool for silencing or excluding him from civic engagement.

236. From May 9, 2025 to the present, Defendants have excluded Plaintiff from at least **twenty-one (21)** public meetings in violation of this court order — including meetings at which Plaintiff was listed by name on the agenda as a subject of discussion or action.

237. These denials were not inadvertent or technical. Defendants were on actual notice of the court order, understood its requirements, and deliberately refused compliance.

238. Instead, Defendants adopted and enforced a policy requiring Plaintiff to submit new, meeting-by-meeting accommodation requests — a requirement not imposed on able-bodied residents and directly contrary to the standing nature of the court-ordered accommodation.

239. In formal correspondence, the Town and the Board of Health expressly "denied" the court-ordered accommodation on the ground that it provided Plaintiff with "more than what other citizens receive." This justification is legally invalid; there was a court order.

240. This denial mirrors Defendants' prior responses to Plaintiff's ADA requests and is part of a broader pattern of retaliation and exclusion. For years, Plaintiff has filed ADA accommodation requests, open meeting law complaints, and civil rights lawsuits against the Town. In response, Defendants have repeatedly implemented new policies and procedural barriers designed to cut off his access to meetings, limit his speech, and chill his participation — including targeted interruptions during public comment, selective enforcement of rules, and public shaming of disability-related requests.

241. By willfully violating a judicial directive issued under G.L. c. 258E, Defendants engaged in coercive conduct designed to interfere with Plaintiff's rights to:

A. Attend and participate in public meetings;

B. Engage in protected political speech under Article 16 of the Massachusetts Declaration of Rights and the First Amendment to the U.S. Constitution;

C. Petition government for redress of grievances;

D. Exercise statutory rights under the ADA and Section 504.

243. The Massachusetts Civil Rights Act, G.L. c. 12, §§ 11H–11I, prohibits any person, whether acting under color of law or otherwise, from interfering by threats, intimidation, or coercion with the exercise or enjoyment of constitutional or statutory rights. Defendants' conduct — the deliberate withholding of court-ordered access — constitutes coercion within the meaning of the MCRA.

244. Independently, 42 U.S.C. § 1983 provides a cause of action against persons acting under color of state law who deprive individuals of rights secured by the Constitution or laws of the United States. By denying access to public meetings in violation of the court's order, Defendants acted under color of law to deprive Plaintiff of his rights under the First and Fourteenth Amendments, the ADA, and Section 504.

245. Defendants' actions were intentional, malicious, and taken in bad faith, and caused Plaintiff concrete harm including loss of civic participation, emotional distress, reputational injury, and ongoing exclusion from community governance.

**WHEREFORE,** Plaintiff respectfully requests that this Court:

## A. On the 42 U.S.C. § 1983 claim:

1.  Enter judgment in Plaintiff's favor and against Defendants **Sarah Campbell**, **Maureen Lepak**, and **Kimberly Simons**, in their **individual capacities**, for compensatory and punitive damages in an amount to be proven at trial;

2.  Enter declaratory and injunctive relief against Defendant **Town of Brookfield**, requiring it to adopt and enforce policies, training, and disciplinary measures to prevent future retaliation against individuals engaging in protected First Amendment activity; and

3.  Award reasonable attorneys' fees and costs under 42 U.S.C. § 1988.

## B. On the Massachusetts Civil Rights Act claim (M.G.L. c. 12, §§ 11H–11I):

4. Enter judgment in Plaintiff's favor and against Defendants **Sarah Campbell**, **Maureen Lepak**, and **Kimberly Simons**, in their **individual capacities only**, for compensatory and punitive damages in an amount to be proven at trial;

5. Award reasonable attorneys' fees and costs under M.G.L. c. 12, § 11I; and

## C. General Relief:

6. Grant such other and further relief as the Court deems just and proper.

**COUNT XI – MONELL LIABILITY UNDER 42 U.S.C. § 1983** *(Against Defendant Town of Brookfield, Entity only )*

**Municipal Policy, Custom, and Practice of Retaliation and Suppression of Protected Speech**

**I. Introduction and Theory of Liability**

246. Defendant Town of Brookfield, through its Select Board, Town Administrator, and other final policymakers, maintained and enforced an official policy and entrenched custom of retaliating against individuals who engaged in protected First Amendment activity. This policy and custom were the moving force behind the violations described in Counts I, X, and XII of this Complaint.

247. These unconstitutional practices manifest through public shaming of dissenters, intimidation of whistleblowers, misuse of harassment prevention orders, selective enforcement of meeting rules, and deliberate noncompliance with court orders granting civic access. Such conduct is carried out by final policymakers or with their express approval, constituting official municipal policy under Monell.

**II. Legal Standard**

248. Under *Monell v. Department of Social Services, 436 U.S. 658 (1978)*, a municipality may be held liable under 42 U.S.C. § 1983 when a constitutional violation results from:

1. an official policy formally adopted or promulgated by the municipality;

2. a persistent and widespread practice or custom that is so permanent and well-settled as to have the force of law;

76

3.  the act or decision of an official with final policymaking authority; or

4.  deliberate indifference to known constitutional violations, demonstrated by the failure to act despite notice of a pattern of such violations.

249. Liability attaches when the municipality's policy, custom, or deliberate inaction is the "moving force" behind the deprivation of constitutional rights.

## III. Formal Notice and Deliberate Indifference

250. The Town was on formal notice of its constitutional obligations no later than March 2021, when it settled a federal civil rights lawsuit by resident John Holdcraft alleging First Amendment retaliation. The settlement should have prompted corrective measures —such as adopting whistleblower protections or training officials on viewpoint-neutral governance—but no such measures were taken. The Town's inaction, despite clear notice, reflects deliberate indifference and allowed its retaliation policy/custom to continue unchecked.

## IV. Illustrative Incidents Demonstrating the Policy and Custom

251. The following incidents, spanning from November 2023 through May 2025, are set out in detail to illustrate the Town of Brookfield's entrenched policy and custom of retaliation, suppression of protected speech, and deliberate indifference to constitutional violations. Each event involves final policymakers or their agents acting with the Town's knowledge and approval, demonstrating that these were not isolated occurrences but part of a sustained, municipality-wide practice. The dates and titles are bolded for clarity,

allowing the Court to quickly identify and review each specific instance supporting

municipal liability under *Monell*.

252. **November 7, 2023 – Assault of First Amendment Auditor by Town Constable.**
Consistent with the Town's custom of tolerating physical aggression toward perceived
critics until public exposure forces action, a First Amendment auditor was physically
assaulted by the Town Constable on Election Day. The Town acted only after the video
went viral, implementing training it had long neglected.

253. On Election Day, a First Amendment auditor visiting Town Hall was physically
assaulted by the Town Constable. The incident was recorded and later posted to an
audience of approximately 160,000 subscribers, resulting in widespread public criticism
and calls to Town Hall. The Constable resigned. Only after the public backlash did the
Town implement First Amendment auditor training for employees.

254. This incident demonstrates the Town's policy and custom of tolerating physical violence
against members of the public until widespread public exposure forces reactive measures.

255. **November 8, 2023 – Board of Health Chair's husband assaults citizen during
meeting.** In line with the Town's practice of protecting allies from discipline, Maureen
Lepak's husband assaulted a resident during a public meeting, Plaintiff's service dog was
kicked, and another official verbally attacked Plaintiff. No action was taken against any
of them. During a public meeting, Maureen Lepak's husband, Christopher Lepak,
physically attacked resident David Fromm. No warning was issued and he was not asked
to leave.

256. During the same meeting, Plaintiff's service dog Rosie became visibly distressed; video shows Vice Chair Christina Predella walking directly behind Rosie twice. The video shows Rosie's body jerk from the contact, although Plaintiff does not allege that the kick was deliberate. Despite this chaos, Chair Maureen Lepak refused to entertain a motion for a short recess.

257. Immediately afterward, Town official John David Holdcraft verbally attacked Plaintiff. Later, on police body-worn camera, Holdcraft bragged, "*I got Kelleher all riled up and then I put him in his place.*"

258. This incident demonstrates the Town's policy and custom of protecting politically connected individuals from accountability for physical assaults, harassment, and disruptions during public meetings, while allowing the targeting of perceived political opponents.

259. **November 9, 2023 – Assault and Harassment of Town Officials in Town Hall** Following the same pattern of excusing misconduct by favored individuals, John David Holdcraft disrupted Town Hall operations, verbally abusing others in the building. The Select Board ignored the misconduct entirely.

260. The day after the Board of Health confrontation, John David Holdcraft attempted to gain access to the Town Hall kitchen while Select Board Chair Tom Regan and Town Administrator Kelli Robbins were having a private conversation. Holdcraft loudly demanded entry, pushing the door into the Town Administrator, shouted profanities.

261. The incident escalated to the point where an individual present for a Highway Department job interview attempted to intervene. Mr. Holdcraft initially admitted telling the interviewee to "shut the f*** up and mind his business" and to "sit the f*** down," though later attempted to qualify his statements. The altercation was loud enough to disrupt other Town Hall activities and clearly outside the bounds of professional conduct.

262. Despite being made aware of the incident, the Select Board took no disciplinary or corrective action. This non-response is consistent with the Town's entrenched custom of tolerating, excusing, and normalizing hostile or unprofessional conduct by favored officials.

263. This incident further demonstrates the Town's policy and custom of allowing politically connected individuals to verbally abuse and physically intimidate Town officials and employees without consequence

264. **January 25, 2024 Failure to Enforce Visitor Code of Conduct Against Politically Connected Individual.** The Town ignored Plaintiff's request to enforce its own Visitor Code of Conduct against Christopher Lepak, demonstrating its custom of selectively applying rules only against perceived opponents.

After the assault at the Board of Health meeting, Christopher Lepak attended a Conservation Commission meeting and, while leaving, confronted resident David Fromm. Lepak got in Fromm's face, calling him "ugly" in an apparent attempt to provoke another physical altercation.

265. Plaintiff reported the incident to the Select Board and specifically requested enforcement of the Town's Visitor Code of Conduct. The Select Board took no action.

266. This incident demonstrates the Town's policy and custom of ignoring clear violations of its own codes of conduct when committed by politically connected individuals, thereby emboldening further misconduct.

267. **February 1, 2024 Intimidation of Prospective Conservation Commission Appointee.** Consistent with its policy of permitting interference in civic appointments, John David Holdcraft intimidated a candidate into withdrawing his application. The Town took no action to investigate or deter such conduct

268. While serving as a Town official, John David Holdcraft went unannounced to the home of Jeffery Evans, a neighbor of Plaintiff and a candidate for appointment to the Conservation Commission, and threatened Evans and his business if he accepted the position. Evans withdrew his candidacy immediately. Plaintiff reported the incident to the Select Board, provided Evans' contact information, and requested action. The Board never contacted Evans and took no steps to address the intimidation.

269. This incident demonstrates the Town's policy and custom of allowing officials to interfere with the appointment process and intimidate prospective board members without consequence.

270. **February 29, 2024 – Constructive Discharge , Intimidation of Town Assessor Al Jones.** Following the Town's custom of tolerating intimidation by senior officials,

81

Richard Chaffee damaged Town property and intruded on a private meeting. He faced no discipline and later won the position of Assessor.

271. While meeting privately with a senior citizen, Jones told Chaffee he could not enter the office. Chaffee repeatedly pushed against the antique, historically significant door, causing damage. When he entered, the senior citizen physically intervened to prevent further intrusion.

272. No discipline followed; Jones resigned, and Chaffee later won the position of Assessor.

273. This incident reflects the Town's policy and custom of tolerating physical intimidation, property damage, and interference with municipal operations by elected officials.

274. **March 2024 – Constructive Discharge , Harassment and Assault of Town Administrator Kelly Robbins.** The Town, acting with deliberate indifference to the safety of even its highest-ranking employees, ignored repeated assaults and harassment of its Town Administrator until she resigned.

275. While serving as Town Administrator, Kelly Robbins — also a licensed attorney — had repeated conflicts with Board of Health Chair Maureen Lepak over governance matters.

276. During this time, John David Holdcraft, a known associate of certain Town officials, including Lepak , repeatedly followed Robbins around Town Hall, threw water in her face, and physically assaulted her. These acts occurred on Town property during business hours. Robbins had a documented PTSD diagnosis.

277. The Town took no action to investigate or protect Robbins. **She was forced to resign,** forcing the Town to hire outside counsel for all legal matters.

278. This incident illustrates the Town's policy and custom of tolerating harassment and assault of employees, including those with disabilities, by politically connected individuals.

279. **April 4, 2024 – Constructive Discharge , Intimidation of Town Treasure Amy Lane-Carmody.** Following the same policy of protecting elected officials from accountability, the Town took no action when Chaffee cornered and yelled at the Town Treasurer, leading to her resignation.

280. After hearing of a statement he believed Amy Lane-Carmody had made about him, Chaffee entered her small, windowless office, closed the door behind him, and yelled at her while standing between her and the only exit.

281. Following this, Amy would only return to work under heightened security, staying behind two locked doors (between the Town Clerk's office and Treasurer's Office). She ultimately resigned.

282. This incident reflects the Town's policy and custom of permitting elected officials to engage in physical intimidation without discipline or protective intervention.

283. **July 1, 2024 Constructive Discharge – Harassment and Retaliation Against Plaintiff Christopher Kelleher, Conservation Commission Chairman.** Pursuant to the Town's custom of retaliating against those who report misconduct, Plaintiff was driven

from his position as Conservation Commission Chair after reporting environmental

violations by Chaffee.

284. Plaintiff was confronted and physically blocked by Chaffee after cooperating with the

FBI, mocked for his service dog, and targeted for removal from the Board of Health and

Conservation Commission.

285. Holdcraft used public meetings to state Plaintiff had "mental health" issues and should

resign. He repeatedly targeted Plaintiff's service dog despite police reports and a 258E

order.

286. After Holdcraft was restrained, Chaffee escalated the harassment and sought Plaintiff's

removal as Conservation Commission Chair after Plaintiff reported Chaffee's illegal

dumping on state land near wetlands.

287. Unable to perform his duties due to unrelenting harassment, and with the Town refusing

to provide protection or corrective action, Plaintiff was **forced to resign,** citing Chaffee

and Holdcraft as the cause. Bradford Kadelski , Lindsay Rockwood, Dennis Tucker, and

Kelly Robbins were also forced to resign under similar circumstances, each after

sustained harassment or retaliation by Town officials.

288.This incident demonstrates the Town's policy and custom of retaliating against officials

who report misconduct or environmental violations by senior figures, ultimately driving

them from public service.

289. **December 2024 – Constructive Discharge of Tree Warden Dennis Tucker**. The Town tolerated Chaffee's self-dealing in the tree removal bidding process, driving the Tree Warden to resign.

290. When Select Board Chaffee misconduct was raised by Tree Warden Dennis Tucker during a public Select Board meeting,  Chaffee to launch into a prolonged, aggressive exchange, repeatedly over-speaking Tucker and derailing his comments. Chaffee's allies, including Washburn and Holdcraft, joined in. The result was a coordinated attack and public shaming of Tucker for bringing the matter forward — a tactic consistent with the Town's established pattern of retaliating against individuals who expose misconduct by its officials.

291. Tucker resigned citing a toxic work environment created by Chaffee. Earlier that year, after the Town solicited bids for hazardous tree removal, one bidder was Chaffee's son. When it became clear his son would not win, Chaffee entered Town property without authorization and cut down two designated trees himself, taking the wood.

292. This destroyed the integrity of the bid process and denied the winning bidder the contract. Despite apparent violations of G.L. c. 242, § 7 (tree trespass) and theft of Town property, (wood)  no discipline was imposed. Tucker was punished for raising his concerns.  **Tucker was forced to resign due to the Town's unwillingness to address Chaffee's conduct**.

293. This incident demonstrates the Town's policy and custom of tolerating self-dealing and interference with municipal procurement by elected officials.

294. **May 2025 – Former Select Board Chair Bradford Kadelski declined to seek re-election and withdrew from further public service,** citing fear of continued personal targeting, sexual harassment, public shaming, hostile treatment and retaliation from within Town Hall. His decision was not a voluntary departure based on policy disagreement or personal preference, but the result of an environment so toxic and retaliatory that remaining in office posed an unacceptable risk to his personal well-being. Consistent with its policy of ignoring harassment when politically expedient, the Town failed to address severe sexual harassment by Holdcraft, resulting in Kadelski's withdrawal from public service.

295. Kadelski was subjected to an ongoing campaign of sexual harassment by then–Town official John David Holdcraft, with tacit allowance from other senior officials.

296. Holdcraft repeatedly stated that Kadelski "wore women's panties" that were "soiled with feces," made late-night phone calls to ask "what color panties" he was wearing, and escalated to mailing adult diapers to Town Hall.

297. Before a public Select Board meeting, Holdcraft removed a pair of visibly brown-stained women's underwear from a folder and tossed them to Kadelski in front of other officials. Plaintiff Kelleher, former member of the Board of Health, warned they were a biohazard under OSHA; the Town took no precautions, the stain panties were handled by several town employees moved from desk to desk.

298. KP Law, the towns counsel, advised "nothing could be done" because the incident occurred before the meeting.

299. Chaffee told Kadelski he wanted to "unseat" him and replace him with Sarah Campbell.

300. When Kadelski sought a 258E order, Holdcraft retaliated by confronting him at Town Hall. Kadelski declined to seek re-election, citing fear for his safety, and stopped attending public meetings. Holdcraft continues to appear without restriction.

301. This incident exemplifies the Town's policy and custom of ignoring sexual harassment and retaliation when the perpetrator is politically connected.

302. **April 2025 – Solicitation of Assault on Plaintiff; Retaliation Against Investigating Police Chief.**

303. On or around April 17, 2025, inside Brookfield Town Hall, Plaintiff's regular FedEx delivery driver — a business contact with whom Plaintiff interacts regularly through his FedEx-authorized shipping center — reported that Select Board Chair Richard Chaffee "joked" about physically assaulting Plaintiff in exchange for money, alcohol, or a handshake. The driver initially told Plaintiff that the offer was $50. Even Chaffee later told the Worcester Telegram & Gazette he "heard it was $25."

304. The remark was made to a third-party vendor providing essential delivery services to both the Town and Plaintiff's business, in the context of Plaintiff's status as a disabled resident with ongoing federal civil rights and MCAD complaints against the Town — in which Chaffee is a named Respondent. Plaintiff does not find such remarks humorous; as a person with Complex PTSD, he experienced the comment as threatening, intimidating, and intended to humiliate and create a hostile environment.

305. The timing was particularly suspect: the incident occurred only one week before a scheduled state court injunction hearing, consistent with a pattern in which Town officials attempt to destabilize and distract Plaintiff immediately before significant legal proceedings.

306. Plaintiff promptly reported the incident to the Brookfield Police Department on April 24, 2025. The matter was documented in a formal incident report, with body-worn camera footage of the initial complaint and Town Hall security video confirming the presence of Chaffee, Town Administrator Ronald Aponte, and the driver together in the building at the time alleged.

307. Despite the gravity of the allegation — involving the Town's highest-ranking elected official and its chief administrator — the Select Board took no internal action, conducted no interviews, and made no public acknowledgment. Instead, after the Worcester Telegram & Gazette reported that the Chief of Police had opened an active investigation, Chaffee placed a "performance review" of the Chief on the Select Board's agenda for the first time in his tenure. The timing and context strongly indicate that this was a retaliatory measure aimed at pressuring, discrediting, or intimidating the Chief for investigating the reported threat.

308. This incident demonstrates the Town's entrenched custom of shielding politically connected officials from accountability, retaliating against those who investigate or report misconduct, and taking no corrective action even when the alleged conduct involves a solicitation of violence against a disabled resident engaged in protected activity.

309. **June 2025 – Constructive Discharge Harassment and Retaliation Against Highway Department Employee Lindsay Rockwood.** Following its established custom, the Town retaliated against Rockwood after she filed an MCAD complaint, forcing her resignation through adverse job actions.

310. Lindsay Rockwood, a Highway Department employee and grant writer, was subjected to a sustained campaign of harassment and retaliation by Select Board member Richard Chaffee, private citizen Pat Washburn, John Holdcraft, and Conservation Commission Vice Chair Sarah Campbell.

311. Chaffee publicly disparaged Rockwood's abilities, stating she was "good at cleaning the office and doing paperwork" but should not be "out in the highway department running trucks."

312. After Rockwood filed an MCAD complaint naming Chaffee, he demanded that the Town Administrator provide him with "every single email" Rockwood had sent or received, on a continuing basis, and repeatedly placed her job performance, title, qualifications, and employment status on the Select Board agenda for public debate.

313. Rockwood reported to the Town that Holdcraft had yelled at her at the Highway Department, and that she was in a state of fear for the first time at her job. Campbell also went to her workplace, screaming at her for allegedly providing Plaintiff Christopher Kelleher with a public records request related to an "Order of Conditions" that Campbell had fabricated to bypass the Wetlands Protection Act.

314. Instead of protecting Rockwood, the Town retaliated: moving her to a small, windowless office, cutting her hours in half, and eliminating her benefits.

315. Rockwood resigned twice; the second time, after hours and benefits were cut, was permanent. She was forced to resign due to sustained harassment and the Town's refusal to intervene.

316. **2023–2025 – Retaliation Against Residents Filing Open Meeting Law Complaints**. The Town has an entrenched policy of publicly shaming and ignoring complainants, often in direct violation of statutory deadlines, to chill participation

317. In Brookfield, the filing of an Open Meeting Law ("OML") complaint reliably triggers public ridicule, personal attacks, and efforts to chill the complainant's First Amendment right to petition government for redress of grievances. This practice is not confined to a single board—it occurs across the highest levels of town governance, including the Select Board, Board of Health, Conservation Commission, and Cable Advisory Board. The pattern is consistent:

318. **Public Shaming at Meetings** – After a citizen files an OML complaint, the relevant board uses public meetings to attack the complainant's character, speculate about motives, and make unrelated allegations rather than addressing the merits of the complaint.

319. **Unprofessional Official Responses** – Boards then transmit written responses to the Attorney General's Office that repeat these personal attacks, adopting a combative tone rather than attempting resolution. For example:

320. Select Board Member Sarah Campbell stated on the record in a public meeting that OML complaints are "nothing but a waste of [her] time" and "not legitimate". She further stated that she wanted to find ways to prevent citizens from filing such complaints. At the next meeting, she attempted to clarify that she meant only Mr. Kelleher—who is a citizen of Brookfield—demonstrating that her remarks were directed at silencing a specific individual.

321. Select Board Member Richard Chaffee has publicly dismissed OML complaints, telling Mr. Holdcraft that his complaints were "straining the board," and similarly criticizing Mr. Kelleher's filings. Chaffee falsely claimed that the Town has "not received more OML complaints in the last 50 years" than it has from Mr. Kelleher, despite the OML statute having been enacted far more recently.

322. Many Brookfield boards simply ignore OML complaints altogether , despite the statutory requirement under G.L. c. 30A, § 23(b) to meet and respond within 14 business days. The Conservation Commission, for example, failed to meet or respond to at least 12 such complaints, each deemed violations by the Attorney General's Office. Rather than acknowledge the violations, Campbell downplayed them in public session. The Select Board has likewise failed to respond to recent OML complaints, even after the Attorney General issued a warning that further noncompliance would be treated as deliberate and could result in civil penalties of up to $1,000.

323. The Town's official written responses often contain language so unprofessional that they would discourage any reasonable citizen from pursuing the OML enforcement process. This retaliatory posture appears calculated to deter residents from exercising their

statutory and constitutional rights to seek transparency and accountability in municipal governance.

324. This conduct is not sporadic or accidental—it is the product of an entrenched municipal policy, custom, and practice of punishing those who challenge Brookfield's boards through lawful OML enforcement. By normalizing public shaming, refusing to address valid complaints, and using official channels to disparage citizens to the Attorney General's Office, the Town has created a retaliatory climate that chills speech, suppresses dissent, and deprives residents of their rights under the Massachusetts Constitution and the First Amendment.

325. **2023- 2025 – Retaliation and Obstruction Against Public Records Requesters.** The Town employs a consistent practice of obstructing access to public records through intimidation, inflated costs, delays, and public ridicule.

326. The Town of Brookfield has a documented history of failing to comply with the Massachusetts Public Records Law, G.L. c. 66, § 10. The Town has been the subject of negative media coverage for these practices, and the pattern remains entrenched: residents who file lawful public records requests are routinely met with obstruction, retaliation, or both. This retaliation occurs in multiple forms:

327. Direct Interference by Officials – When a request was made for a copy of an unlawful Order of Conditions issued by the Conservation Commission to the Highway Department, the Commission's Vice Chair entered the office and shouted at the employee

to withhold the record. In other instances, officials have simply refused to produce records even after the Massachusetts Supervisor of Records ordered their release.

328. Refusal to Comply with Final Orders – The Board of Health received a public records request that was appealed to the Supervisor of Records. The Supervisor ordered production of the documents, yet the Board refused outright to comply.

329. Inflated Cost Estimates and Data Sabotage – In one case, a requester sought four hours of video footage. The Town demanded payment for five hours of staff time to produce it —an implausible claim given that four hours of video can be exported in real time. After payment was made, the Town produced the footage as 963 separate micro-files, rendering the content practically unusable.

330. Deliberate Delay Tactics – Frequently, requests receive no response at all until the requester appeals to the Supervisor of Records, triggering a 20-business-day delay. After the Supervisor orders release within 10 business days, the Town still fails to comply, using the procedural timeline itself as a tool to frustrate access.

331. Public Shaming and Social Media Exclusion – Select Board members, including Richard Chaffee, have publicly ridiculed citizens for filing public records requests. In one instance, a citizen who requested records from the Board of Health was immediately blocked on Facebook by the Board's Chair. Because the Chair uses her personal Facebook account to post public health warnings and alerts, the blocking excluded the citizen from timely access to important safety information.

332. This is not a series of isolated incidents—it reflects a municipal policy, custom, and practice of retaliating against and obstructing public records requesters. By employing a combination of intimidation, refusal to comply with lawful orders, inflated costs, deliberate delays, and public humiliation, the Town of Brookfield has normalized a culture of secrecy. This policy directly undermines the Massachusetts Public Records Law, chills residents from exercising their statutory rights, and violates constitutional protections for petitioning government.

333. **May 9, 2025 – Misuse of Harassment Prevention Orders to Suppress Press Contact.** Consistent with the Town's entrenched policy of misusing judicial process to suppress criticism, Town officials labeled Plaintiff's involvement in press coverage as "harassment" and used it as grounds to obtain or support G.L. c. 258E harassment prevention orders. In sworn statements, both Maureen Lepak and Sarah Campbell claimed that the Worcester Telegram & Gazette's reporting on their own 258E proceedings — and Plaintiff's role in speaking to the press — constituted "harassment."

334. This was not limited to press interviews. Lepak further asserted that Plaintiff's creation of a small local newspaper, the *Brookfield Examiner*, was also harassment. The Brookfield Examiner lawfully reported on matters of public concern, including town governance and official conduct, and made public meeting recordings available online. Lepak is on record stating she did not want "her" Board of Health meetings recorded — a practice directly tied to the Examiner's mission and to Plaintiff's exercise of lawful public oversight.

94

335. By redefining press coverage of ongoing judicial proceedings, the establishment of a local newspaper, and the public recording of open meetings as "harassment," Lepak and Campbell weaponized G.L. c. 258E to suppress protected speech, chill public reporting on their official actions, and obstruct dissemination of information about town governance. This conduct reflects the Town's policy and custom of using judicial process not to address genuine harassment, but to silence critics, prevent scrutiny, and retaliate against those who expose misconduct.

**V. Failure to Adopt Safeguards Despite Repeated Incidents**

336. The Town's liability under Monell is reinforced by its sustained failure to implement even the most basic safeguards despite years of notice that its officials were engaging in constitutional violations.

337. By March 2021, the Town had already settled a federal civil rights case for First Amendment retaliation. Since then, it has faced multiple MCAD complaints, open investigations, repeated findings of statutory violations by the Attorney General's Office, the constructive discharge of numerous employees, and the resignation or removal of public officials citing harassment and retaliation. Each of these events independently put the Town on notice that its practices were unconstitutional.

338. Yet the Town — acting through final policymakers — has taken no meaningful corrective action. Specifically, it has:

    A. failed to train officials on First Amendment, ADA, or anti-retaliation obligations;

    B. failed to protect its employees and Town Officials from retaliation;

95

C. failed to adopt whistleblower protections;

D. failed to prohibit or regulate the use of G.L. c. 258E harassment prevention orders by municipal officials;

E. failed to establish a code of conduct protecting civic criticism; and

F. failed to investigate or discipline retaliation by senior officials.

339. These are not mere policy oversights — they are conscious choices made in the face of repeated and obvious need. The Town's final policymakers were aware of the ongoing violations through public complaints, MCAD charges, lawsuits, Attorney General determinations, and the high-profile resignations of key employees.

340. By choosing inaction over reform, the Town ratified the unconstitutional conduct of its officials and signaled that such conduct was acceptable, inevitable, and even encouraged. This deliberate indifference ensured that the same misconduct — retaliation against critics, suppression of protected speech, and obstruction of lawful access to government — would recur.

341. Conclusion on Policy and Custom Taken together, these incidents reveal a deliberate, municipality-wide pattern of conduct by the Town of Brookfield, carried out by final policymakers and their agents, that consistently targets individuals engaged in protected activity. The Town's repeated failure to investigate, discipline, or prevent such conduct — and, in many cases, its active participation in it — demonstrates an entrenched policy and custom of retaliation and suppression of speech. The predictable and repeated recurrence of these violations, without any preventative measures, demonstrates that the **Town's**

omissions were the **"moving force"** behind the constitutional deprivations described in Counts I, X, and XII. This pattern is the moving force behind the constitutional injuries alleged in this Complaint and gives rise to municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in his favor and against Defendant Town of Brookfield;

     A. award compensatory and punitive damages,

     B. order injunctive relief prohibiting further retaliation,

     C.  require the adoption of written anti-retaliation and ADA compliance policies,

     D. mandate training for all municipal officials,

     E. and grant such other relief as the Court deems just and proper.

## COUNT XII – ELECTION INTERFERENCE

**(First & Fourteenth Amendments; Article 9 of the Massachusetts Declaration of Rights; M.G.L. c. 12, §§ 11H–11I)**

*(§ 1983 Claim – Against Defendants Sarah Campbell, Maureen Lepak, Kimberly Simons, and Doe, in Their Individual Capacities, and the Town of Brookfield for Declaratory/Injunctive Relief; MCRA Claim – Against Defendants Sarah Campbell, Maureen Lepak, Kimberly Simons, and Doe, in Their Individual Capacities Only))*

    342. Plaintiff realleges and incorporates all prior paragraphs as if fully set forth herein.

## Legal Standards

343. The First and Fourteenth Amendments to the United States Constitution protect the right to participate in the political process free from governmental suppression, retaliation, or viewpoint discrimination.

344. Article 9 of the Massachusetts Declaration of Rights guarantees that "all elections ought to be free" and that voters have the right to choose their representatives without interference.

345. Under the Massachusetts Civil Rights Act, M.G.L. c. 12, §§ 11H–11I, it is unlawful to interfere with secured constitutional rights through threats, intimidation, or coercion.

## Factual Basis

346. In April–May 2025, Plaintiff engaged in lawful, protected political activity in connection with the May 6, 2025 Brookfield municipal election, including:

    A. Promoting a lawful write-in campaign for Michael Seery for the Board of Health;

    B. Distributing political flyers critical of Defendants Campbell and Lepak;

    C. Publishing videos and public records documenting official misconduct;

290. Plaintiff did not act with Mr. Seery's prior approval to "run" him as a candidate. Rather, the write-in campaign was undertaken for three lawful purposes:

    A. To gauge and publicly demonstrate community support for Mr. Seery as an alternative to the sole ballot candidate for the Board of Health; and

B. To encourage Mr. Seery to consider accepting the position by showing the strength of public demand for his leadership; and

C. If Mr. Seery won and declined to serve, to trigger the statutory process by which the Select Board could appoint a replacement to the Board of Health — thereby placing that appointee under Select Board oversight, as opposed to the current Board of Health, which was operating in a rogue and unaccountable manner.

291. Less than one week before the election, on or about April 29, 2025, the Town of Brookfield published a false and misleading "election notice" on its official website stating that Michael Seery "is not a write-in candidate" and "will not serve if elected." This statement was legally false, as Massachusetts law allows any eligible voter to be elected via write-in votes.

292. The posting also included a list of "official" candidates, implying that only those listed could or should receive votes. By presenting this list immediately after the false statement regarding Seery, the Town created the misleading impression that no other candidates — including lawful write-ins — were valid voting options. This framing gave official imprimatur to certain candidates and discouraged voters from casting write-in ballots.

293. The April 29 notice and "official" candidates list were disseminated during the critical final days of voting, discouraging voters from supporting the Seery write-in campaign and chilling support for Plaintiff's advocacy.

294. In the same timeframe, Defendants Campbell, Lepak, and Simons initiated coordinated harassment prevention petitions under G.L. c. 258E against Plaintiff, resulting in emergency ex parte orders that:

   A. Prevented Plaintiff from entering or being near Town property on election day;

   B. Effectively barred him from distributing campaign materials or speaking in public forums during the last days before the election; and

   C. Suppressed his ability to publish final campaign-related video and print materials.

295. Despite a May 9, 2025 court order requiring accommodations to ensure civic access, Defendants had already used the 258E orders to exclude Plaintiff from campaign activities and public spaces before the election occurred.

296. The election was decided by a margin of 40 votes. The combination of (a) the false April 29 election notice, (b) the misleading presentation of "official" candidates, (c) the judicial gag order obtained through misused 258E proceedings, and (d) denial of public access during the campaign period materially altered the conditions under which voters received information and exercised their franchise.

297. These acts were intentional, coordinated, and undertaken for the purpose of influencing the outcome of the May 6, 2025 election by suppressing political opposition and limiting voter choice.

**Legal Violations**

298. The false election notice, misleading "official candidates" list, and coordinated suppression of Plaintiff's campaign speech constituted viewpoint discrimination, prior restraint, and retaliation in violation of the First and Fourteenth Amendments to the United States Constitution.

299. These acts also violated Article 9 of the Massachusetts Declaration of Rights by interfering with the right to a free and equal election, including voters' ability to support a lawful write-in campaign.

300. Plaintiff's write-in campaign for Michael Seery was undertaken for a lawful political purpose: (a) to demonstrate voter support for an alternative to the sole ballot candidate for the Board of Health; (b) Persuade Seery to accept the role by showing the scale of community support through a strong write-in turnout. and (c) if Seery declined the seat, to trigger the statutory process by which the Select Board could appoint a replacement, thereby bringing the Board of Health under Select Board oversight.

301. The Town's conduct directly interfered with this lawful political strategy and the governance reform mechanism it sought to activate. By discouraging votes for Seery, Defendants obstructed both the expressive purpose of the campaign and the statutory pathway to reform the Board of Health's operations.

302. The threats, intimidation, and coercion used to suppress Plaintiff's election-related speech and deny voters accurate information violated the Massachusetts Civil Rights Act, M.G.L. c. 12, §§ 11H–11I.

*See Anderson v. Celebrezze, 460 U.S. 780 (1983) Burdick v. Takushi, 504 U.S. 428 (1992)*

**Relief Requested**

**WHEREFORE**, Plaintiff respectfully requests that this Court:

**A. On the 42 U.S.C. § 1983 claim:**

1.   Enter judgment in Plaintiff's favor and against Defendants **Sarah Campbell**, **Maureen Lepak**, **Kimberly Simons**, and **John/Jane Doe**, in their **individual capacities**, for compensatory and punitive damages in an amount to be proven at trial;

2.   Enter declaratory and injunctive relief against Defendant **Town of Brookfield**, declaring that the May 6, 2025 municipal election was unlawfully tainted by constitutional violations and ordering a new special election under judicial supervision;

3.   Award reasonable attorneys' fees and costs under 42 U.S.C. § 1988.

**B. On the Massachusetts Civil Rights Act claim (M.G.L. c. 12, §§ 11H–11I):**

4. Enter judgment in Plaintiff's favor and against Defendants **Sarah Campbell**, **Maureen Lepak**, **Kimberly Simons**, and **John/Jane Doe**, in their **individual capacities only**, for compensatory and punitive damages in an amount to be proven at trial;

5. Award reasonable attorneys' fees and costs under M.G.L. c. 12, § 11I.

**C. General Relief:**

6. Grant such other and further relief as the Court deems just and proper.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court grant the following relief:

1. **Election Interference Declaration** – Declare that Defendants unlawfully interfered with the May 2025 Brookfield municipal election by: (a) Coordinating the misuse of judicial harassment prevention orders in the days immediately preceding the vote; (b) Disseminating false or misleading information regarding candidate eligibility and election procedures through official Town channels; and (c) Denying Plaintiff court-ordered remote access accommodations, thereby excluding him from civic participation.

Such acts violated the First and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, and Articles IX, I, and XVI of the Massachusetts Declaration of Rights.

2. **Election Notice Declaration** – Declare that the Town of Brookfield's public election notice dated April 29, 2025 (Exhibit A) misrepresented Massachusetts election law, unlawfully chilled voter participation, and created confusion about who was an eligible candidate.

3. **Abuse of Process Declaration** – Declare that the harassment prevention proceedings initiated by Defendants Campbell, Lepak, and Simons constituted an abuse of process, a retaliatory misuse of the judicial system, and an unconstitutional prior restraint on Plaintiff's protected

political speech; provided, however, that this action does not seek to vacate or reverse any existing order issued under G.L. c. 258E, which remain separately subject to appeal.

4. **ADA / Section 504 Declaration** – Declare that the Town of Brookfield violated Plaintiff's rights under the Americans with Disabilities Act (42 U.S.C. § 12132 et seq.) and Section 504 of the Rehabilitation Act (29 U.S.C. § 794), and further violated a lawful court order, by refusing to provide remote access accommodations necessary to comply with a non-contact directive, resulting in Plaintiff's unlawful exclusion from public meetings during the election period.

5. **Special Election** – Upon a finding of liability, order the Town of Brookfield to conduct a new special election for the Board of Health and Select Board, with public notice to all voters explaining the Court's findings and the legal basis for the remedial order.

6. **Defamation Liability** – Declare that Defendant Karen Reynolds is liable for defamation and libel per se under Massachusetts common law and that Defendant Maureen Lepak is further liable for unlawful retaliation against citizens for exercising their rights under the Massachusetts Public Records Law. Award Plaintiff compensatory and punitive damages accordingly, including for disability-based defamation, reputational injury, and malicious interference with Plaintiff's legal and civic engagement

7. **Damages** – Award Plaintiff compensatory and punitive damages in an amount to be determined at trial, but not less than $1,000,000 jointly and severally against all individual Defendants for violations of:

    A.  42 U.S.C. § 1983 (First Amendment retaliation),

    B.  Abuse of Process,

    C.  Civil Conspiracy, and

    D.  The ADA and Section 504.

8. **Joint and Several Liability** – Award all damages jointly and severally to reflect the unified and concerted nature of the Defendants' conduct.

9. **Attorneys' Fees and Costs** – Award Plaintiff reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, the ADA, the Massachusetts Civil Rights Act.

10. **Permanent Injunction** – Grant permanent injunctive relief enjoining Defendants from:

    A.  Initiating or continuing retaliatory judicial or administrative proceedings targeting Plaintiff's protected civic speech;

    B.  Interfering with court-ordered accommodations; and

    C.  Misusing G.L. c. 258E or other legal mechanisms to suppress constitutionally protected activity.

    D.  Retaliating against, blocking, or otherwise impeding any citizen's access to official public health or government information channels on the basis of having filed a

public records request, engaged in protected political speech, or criticized Town officials.

11. **General Declaration** – Declare that the acts described herein constitute unlawful retaliation, political discrimination, abuse of process, and prior restraint, in violation of the First and Fourteenth Amendments, the ADA, and other constitutional and statutory protections.

12. **Further Relief** – Grant such other and further relief as this Court deems just, proper, and equitable to prevent the ongoing violation of constitutional rights and to restore the integrity of the electoral process.

## REQUEST FOR IMMEDIATE RELIEF UNDER RULE 65

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiff respectfully moves this Court for a narrowly tailored preliminary injunction or temporary restraining order prohibiting the Town of Brookfield and its officials from:

1. Using any official Town website, social media account, or other governmental communication channel to:

   A. State or imply who is or is not an "official" candidate for municipal office;

   B. Publish or disseminate statements concerning Plaintiff or any election that are false, misleading, or reasonably likely to influence votes; or

   C. Misrepresent Massachusetts election law or candidate eligibility criteria.

2. Interfering with Plaintiff's court-ordered accommodations necessary to attend or participate in public meetings, including remote access arrangements.

3. Initiating or maintaining any judicial or administrative proceedings that have the primary purpose or effect of suppressing Plaintiff's constitutionally protected political activity.

4. Prohibiting any Town official, including Defendant Maureen Lepak, from blocking or restricting a citizen's access to online accounts or communication channels used to disseminate official public information, where such blocking is based on the citizen's exercise of rights under the Massachusetts Public Records Law or other protected political activity.

**Immediate relief is warranted** because:

Defendants' misuse of official communication channels and litigation tactics has already caused irreparable harm by chilling voter participation and influencing election outcomes;

Without injunctive relief, similar interference could recur before this Court has the opportunity to adjudicate the merits;

Plaintiff has no adequate remedy at law for the loss of fair electoral conditions, the erosion of public trust, and the ongoing suppression of civic engagement.

This request does ***not*** seek to vacate any existing order issued under G.L. c. 258E, which remain separately subject to appeal in the appropriate forum.

Respectfully submitted,

PLAINTIFF,

CHRISTOPHER KELLEHER

**Christopher Kelleher**
Plaintiff, Pro Se
36 Lake Road
Brookfield MA  01506
508-213-8300 | 23ck22@gmail.com

Dated: August 14, 2025

## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the Court's CM/ECF system, will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)

and that paper copies will be sent to those indicated as non-registered participants.


CHRISTOPHER KELLEHER


**Christopher Kelleher**
Plaintiff, Pro Se
36 Lake Road
Brookfield MA 01506
508-213-8300 | 23ck22@gmail.com


Date: August 14, 2024